**SHEARSON LEHMAN HUTTON, INC., Plaintiff–Appellee,**

v.

**Walter WAGONER, Jr., Trustee, Defendant–Appellant.**

No. 1602, Docket 91–7105.

United States Court of Appeals, Second Circuit.

Argued May 28, 1991.

Decided Sept. 18, 1991.

William M. Laviano, Ridgefield, Conn., for defendant-appellant.

Kevin McCann, Hartford, Conn. (William S. Rogers, Joseph A. Aceto, Tyler Cooper & Alcorn, of counsel), for plaintiff-appellee.

Before CARDAMONE and WALKER, Circuit Judges, and McKENNA, District Judge.*

CARDAMONE, Circuit Judge:

After opening an account with a leading brokerage firm, the principal, by his actions, proved the truth of the old adage—that the cost of keeping one's friends does not lie in what one does for them, but in what one refrains from doing to them. Here the principal sold worthless notes and loan agreements to fellow church members, and used the proceeds to make stock trades in the name of his wholly-owned corporation, which subsequently went bankrupt.

Among the issues we must decide is whether the trustee in bankruptcy, standing in the corporation's shoes, is attempting to assert the noteholders' claims in an arbitration forum against the brokerage house.

## FACTS

In July 1982 Herbert M. Kirschner, a member of Jehovah's Witnesses, formed HMK Management Corporation and, as its sole stockholder, director, and president, he managed, directed, and controlled its trading and business activities. In August, 1982 HMK opened an account with plaintiff Shearson/American Express (Shearson Lehman Hutton's predecessor) (Shearson or appellee) in Greenwich, Connecticut. A second account was opened with the same office in November, 1982 and a third in March, 1983. HMK used these accounts to execute trades on which Shearson took commissions. Because they were not dis-cretionary accounts Shearson had no authority to execute trades on behalf of HMK, absent Kirschner's express order. When HMK opened these accounts it signed Customer Agreements with Shearson that contained arbitration clauses.

HMK's trading was quite active, and since Kirschner was a trusted customer Shearson agreed to his use of a spare desk and a video monitor on the fourth floor of its offices. Shearson's main office was on the ground floor of the same building. The rules of the New York Stock Exchange permit such use of a broker's equipment by its experienced and trusted customers. While trading as HMK, Kirschner was issuing HMK Notes and HMK Loan Agreements to fellow Jehovah's Witnesses and using the proceeds of the loans to make trades in the HMK accounts. Neither Kirschner nor HMK was licensed or registered as a broker or investment advisor, so the trades made with these funds violated Connecticut law. *See* Conn.Gen.Stat. § 36–474 (broker-dealer registration). The Notes and Loan Agreements were not sold or listed on any stock exchange, nor were they sold in or through any Shearson account or recommended or sold by any Shearson salesperson. All of the funds used to trade in the HMK accounts were derived from HMK checks drawn on an HMK bank account in the Connecticut Bank and Trust Company in Ridgefield, Connecticut.

In February and March, 1983 HMK experienced losses, and Shearson attempted to give Kirschner advice in order to minimize them. During these conversations, a Shearson manager asked Kirschner if he had any partners in HMK or was trading with the money of others. Kirschner represented orally, and later affirmed in writing, that he was the sole owner of HMK and was trading only with his own funds. In July, 1984 the manager of the Greenwich office became aware that Kirschner might be using loan proceeds derived from others to trade in the HMK accounts. Af-

---

* Hon. Lawrence M. McKenna, United States District Judge for the Southern District of New York, sitting by designation.

ter meeting with Kirschner on August 6, the manager closed the HMK accounts, and terminated Kirschner's use of Shearson's fourth floor office and equipment. Later in 1984 HMK filed for bankruptcy.

In 1985, HMK noteholders brought suits in federal court against Shearson. In June, 1988 the Trustee in Bankruptcy for the Estate of HMK, Walter Wagoner, Jr., filed a demand for arbitration with the arbitration division of the New York Stock Exchange. The demand stated that it was asserting contractual claims stemming from the Customer Agreements on behalf of HMK, as well as claims that Shearson had breached its fiduciary duty to HMK. Detailing the alleged breach of fiduciary duty, the demand charged that Shearson "engaged in conduct intended to strip HMK of its assets and to make unsuitable investments and to improperly invest trust funds of clients of HMK and of HMK." In particular, it alleged that Shearson knew the trading in the HMK accounts was not suitable for HMK, that Shearson manipulated Kirschner into excessively speculative trading (thereby making Kirschner its implied agent) by disregarding account opening rules and verification requirements and by providing Kirschner the use of the office and equipment, and that Shearson controlled Kirschner by "allowing him, through the use of Shearson facilities to trade with highly leveraged funds," thereby gaining for itself "extraordinarily high" commissions. Finally, it accused Shearson of churning the HMK accounts.

Shearson asked the New York Stock Exchange to decline to accept the arbitration, but the Exchange refused. Shearson then moved for a temporary restraining order and a preliminary injunction in the United States District Court for the District of Connecticut (Eginton, J.). These motions were referred to a magistrate, who on December 27, 1988 issued a proposed ruling denying the motion for a preliminary injunction, holding that though it was difficult to discern precisely what the trustee was alleging, it appeared to be a "breach of contract claim" properly brought within New York's six-year statutory period. The proposed ruling also noted that the claims

bordered on being frivolous, but stated that this determination should be left to the arbitrators. The magistrate also found that the trustee had standing to raise the claims at issue and that he had not waived his right to arbitration by accepting and using pretrial discovery obtained from the earlier instituted noteholders' federal actions.

On reconsideration, the magistrate reversed himself, and ruled that HMK's claims in fact sounded in tort and did not adequately allege a breach of contract. Applying the Connecticut three-year statute of limitations on tort claims, the magistrate recommended that the district court grant Shearson's motion for an injunction because the statute of limitations had expired. On February 24, 1989 the district court granted the preliminary injunction on that basis and on January 8, 1991 it granted a permanent injunction barring the trustee from instituting or pursuing arbitration of its claims against Shearson. The trustee appeals.

## DISCUSSION

### I Trustee's Standing

█ Although the district court based its decision solely on the ground that HMK's claims sound in tort and that the applicable three year statute of limitations has run as to those claims, it is necessary first to address the question of the trustee's standing to assert these causes of action. Because standing is jurisdictional under Article III of the United States Constitution, *see Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471–76, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982), it is a threshold issue in all cases since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court.

Shearson asserts that the trustee lacks standing because the claims he alleges on behalf of HMK's estate are really those of the noteholders, and because any action HMK itself might assert regarding Shearson's alleged participation in looting the

corporation is barred by virtue of the fact that HMK's sole shareholder and officer was the principal that engaged in the looting. As a rule, unless the party whose standing is at issue has a " 'personal stake in the outcome of the controversy,' " the suit does not meet the case or controversy requirement of the Constitution. *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). A party must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* 422 U.S. at 499, 95 S.Ct. at 2205. In our analysis of the question presented, the "case or controversy" requirement coincides with the scope of the powers the Bankruptcy Code gives a trustee, that is, if a trustee has no power to assert a claim because it is not one belonging to the bankrupt estate, then he also fails to meet the prudential limitation that the legal rights asserted must be his own.

■ Under the Bankruptcy Code the trustee stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy. *See* 11 U.S.C. §§ 541, 542 (1988); *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 429, 92 S.Ct. 1678, 1685, 32 L.Ed.2d 195 (1972); *Cissell v. American Home Assur. Co.,* 521 F.2d 790, 792 (6th Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 857, 47 L.Ed.2d 83 (1976). The trustee insists he is not asserting the claims of the noteholders, so it is unnecessary for us to delve deeply into when, if ever, a trustee may sue a third party on behalf of the bankrupt's creditors. *See Lank v. New York Stock Exchange,* 548 F.2d 61, 67 (2d Cir.1977).

Nevertheless, we do need briefly to explore when it is that a trustee may assert claims on behalf of the corporation's creditors—as opposed to those of the corporation itself—in order to clarify what types of claims belong to a corporation and what types of claims belong to its bondholders and other creditors. We then go on to consider whether any of the claims asserted in this litigation are those upon which HMK could have sued, and which may therefore successfully be prosecuted by the trustee on its behalf.

■ It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself. *Caplin,* 406 U.S. at 434, 92 S.Ct. at 1688 (trustee in Chapter 10 reorganization has no standing to sue indenture trustee, who allegedly permitted corporation to violate indenture, on behalf of holders of debentures issued by the corporation). *In re Petroleum Corp.,* 417 F.2d 929, 934 (8th Cir.1969) ("Generally, the trustee of a bankrupt has no power to press the general claims of the bankrupt's creditors against third parties.") (*citing Barnes v. Schatzkin,* 215 A.D. 10, 212 N.Y.S. 536 (1st Dept.1925), *aff'd,* 242 N.Y. 555, 152 N.E. 424 *cert. denied,* 273 U.S. 709, 47 S.Ct. 100, 71 L.Ed. 852 (1926)); *In re D.H. Overmyer Telecasting Co.,* 56 B.R. 657, 658–59 (Bankr.N.D. Ohio 1986) (bankrupt in Chapter 11 could not bring claim that attorneys for the unsecured creditors' committee helped former officer subvert the function of the committee, thereby aiding bankrupt's fraudulent transfers, because that claim belonged to the unsecured creditors and the creditors' committee, not the bankrupt, and because a trustee "lacks standing to assert the claims of creditors against third parties who are alleged to bear responsibility for a debtor's loss"); *Barnes v. Schatzkin,* 215 A.D. at 13, 212 N.Y.S. at 537 (even when defrauded creditors assigned to trustee their claims against New York Stock Exchange for aiding and abetting bankrupt in defrauding them, trustee lacked capacity to sue because the claims were never part of the assets of the bankrupt before its insolvency). These decisions stand for the proposition that when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors. Yet, a question remains whether in the case at hand there is any damage to the *corporation,* apart from

that done to the third-party creditor note-holders.

To resolve whether the trustee has asserted claims that belong solely to HMK, we must determine what claims HMK possessed against Shearson *before* HMK went bankrupt. 15 *Collier on Bankruptcy*, ¶ 541.04 at 541–22 (15th ed. 1989) ("the critical time as of which the property comprising the estate is to be determined ... is the date upon which the petition is filed"); *Caplin*, 406 U.S. at 429 & n. 19, 92 S.Ct. at 1685 & n. 19; *Cissell*, 521 F.2d at 792. In assessing whether HMK possessed a claim against Shearson, we ask whether, assuming the truth of all the facts set forth above,—which are uncontested except for the degree of Shearson's knowledge of or participation in HMK's actions—Shearson could have been held liable on any legal theory presented in the demand for arbitration.

Normally this would include not only a determination that the right would run to the corporation rather than to its creditors, but also a determination that HMK would have been able to withstand a motion to dismiss for failure to state a claim. *See, e.g., Cissell*, 521 F.2d at 792 (holding as a matter of law that when condition precedent clear on the face of the insurance policy had not been met before insolvency, trustee had no cause of action because none had accrued before bankruptcy). The circumstance that sets this case apart is that rather than pursuing HMK's rights in a judicial forum, the trustee here is seeking arbitration, eliminating therefore any assessment by us of the legal sufficiency of the claim presented, though not from determining the question of the trustee's standing.

Shearson argues that a patently frivolous claim may nevertheless be dismissed, citing *Hamilton Life Ins. Co. v. Republic Nat'l Life Ins. Co.*, 408 F.2d 606, 609 (2d Cir.1969). The cited language in *Hamilton* is *dicta*. Further, the Supreme Court has made it clear that whether HMK would have been able to withstand a motion to dismiss on the grounds that it is frivolous had it brought its claims in federal district

court is not a question upon which we are to pass, for we may not "rule on the potential merits of the underlying claims ... even if it appears to the court to be frivolous." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649–50, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986). Thus, we review the claims the trustee asserts only to determine whether a corporation in HMK's position is entitled to bring such a claim, not whether it has merit.

■ Having reviewed the demand for arbitration, we believe it resolves itself into two claims. The first is that Shearson churned the HMK accounts. HMK would have had standing to bring such a claim because churning may form the basis for causes of action in fraud as well as breach of contract. *See, e.g., Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1150, 1153–54 (3d Cir.1989) (trustee in bankruptcy for corporation brought churning claim against securities broker); *DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d 1312, 1314–19 (7th Cir.1989) (not-for-profit corporation brought breach of contract, fraud, and breach of fiduciary duty claims based in part on churning of account); *M & B Contracting Corp. v. Dale*, 795 F.2d 531, 532–33 (6th Cir.1986) (corporation brought churning claim against securities broker). Because as a matter of law, HMK would have had standing to bring a churning claim, it follows that the trustee also has standing.

■ The second claim made in the demand is that Shearson "engaged in conduct intended to strip HMK of its assets and to make unsuitable investments and to improperly invest trust funds of clients of HMK and of HMK." This demand repeats variations on the same theme—presenting it as a number of separate claims—but the essence of all the formulations is that Shearson aided, abetted, and unduly influenced Kirschner in making bad trades that dissipated corporate funds. First, to the extent this claim alleges money damages to the "clients of HMK," it belongs only to the creditors and the trustee has no stand-

ing to assert it. *See Caplin,* 406 U.S. at 434, 92 S.Ct. at 1688.

■ Second, to the extent the demand alleges money damages to HMK itself, it is uncontested that HMK's sole stockholder and decisionmaker, Kirschner, not only knew of the bad investments, but actively forwarded them. A claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation. *See In re D.H. Overmyer Telecasting Co.,* 56 B.R. at 659; *Barnes v. Schatzkin,* 215 A.D. at 11, 212 N.Y.S. at 537; *cf. In re Petroleum Corp.,* 417 F.2d at 935 ("It is unnecessary in the fair administration of the bankrupt's estate to ... require the trustee to undertake collection of the creditor's purely personal claims against those parties whose basic relation with the bankrupt is that of sharers in a common liability.").

*Overmyer Telecasting Co.* illustrates the point. There a law firm filed a proof of claim for $18,000 in attorneys' fees for services rendered to the unsecured creditors' committee in Telecasting's Chapter 11 case. Telecasting filed a counterclaim alleging that the law firm helped Daniel H. Overmyer defraud the corporation by packing the committee with employees and subordinates, thereby subverting the committee's function. The bankruptcy court held that Telecasting's fraud claim belonged to the unsecured creditors and the creditors' committee, not to the corporation, because though a class of creditors had suffered harm, the corporation itself had not. 56 B.R. at 661. Relying on *Caplin,* it noted that the law firm had no fiduciary duty to the debtor corporation, and found that even though Telecasting alleged that it had suffered "great damage" by reason of the fraud, the claim—which asserted the firm permitted the corporation "to engage in transactions which caused its assets to be squandered and which operated as a fraud on creditors", *id.* at 659—belonged to the creditors, not the corporation. *Overmyer Telecasting* also relied on *Barnes v. Schatzkin* as holding that "a reorganization trustee lacks standing to assert the claims of creditors against third parties who allegedly aided the bankrupt in diverting its assets." *Id.*

We believe these cases control the instant issue, especially given that Shearson owed no fiduciary duty to HMK other than to execute the trades requested because the accounts were non-discretionary. *See Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 732 F.2d 859, 862 (11th Cir.1984). The case cited by the trustee, *C.F.T.C. v. Chilcott Portfolio Management, Inc.,* 713 F.2d 1477 (10th Cir.1983), is distinguishable not only because there the receiver was asserting federal securities fraud claims that the court concluded belonged to the corporation, but also because the court expressly declined to address the question of standing. *Id.* at 1482–83. We therefore hold that the trustee lacks standing to bring the second claim, which belongs solely to the creditors.

## II Statute of Limitations

Having decided that the trustee has standing to bring only the churning claim, we next consider whether the district court erred in granting summary judgment in Shearson's favor as to this claim on the grounds that it is time-barred. The district court's opinion on this point is somewhat unclear. It decided the claim sounded in tort and that the statute of limitations had therefore expired, but failed to state how it arrived at that conclusion. It could have done so in one of two ways. Either it assumed it had power to determine the statute of limitations question—without first examining the scope of the arbitration agreement to see whether the trustee's claim fell within it—and adopted the three-year limitations period because it believed the causes of action sounded more in tort than contract; or, alternatively, it implicitly found that the claim fell outside the scope of the arbitration agreement because it asserted a cause of action sounding in tort, and then went on to decide as a matter of law that they were time-barred. On either basis, we think the district court erred.

■ We address the two possible interpretations of its holding. If we take the

view that the trial court decided the statute of limitations question itself—before examining the scope of the agreement—that conflicts with the rule that it is up to the arbitrators, not the court, to decide the validity of time-bar defenses. *Conticommodity Serv. v. Philipp & Lion*, 613 F.2d 1222, 1224–25 (2d Cir.1980). Although *Conticommodity* involved a one-year time limitation set forth in the arbitration agreement itself, we stated emphatically that *any* limitations defense—whether stemming from the arbitration agreement, arbitration association rule, or state statute—is an issue to be addressed by the arbitrators. *Id.; see also Reconstruction Fin. Corp. v. Harrisons & Crosfield, Ltd.*, 204 F.2d 366 (2d Cir.), *cert. denied*, 346 U.S. 854, 74 S.Ct. 69, 98 L.Ed. 368 (1953) (affirming district court's denial of petition to stay arbitration, we assumed, arguendo, that six-year statute of limitations would bar the plaintiff's action, but nevertheless held that it was the role of the arbitrators to determine its effect). It follows from these prior holdings that if the churning claim falls within the scope of the arbitration clauses in the Customer Agreements, the district court went beyond its authority in addressing the statute of limitations issue.

■ If, on the other hand, we assume the trial court first decided that the churning claim fell outside the scope of the arbitration agreement before reaching the statute of limitations question, then it also erred. We have said that a court asked to stay arbitration has four tasks:

[F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration.

*Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir.1987) (citations omitted). Only the scope of the agreement is at issue here, and we review the district court's determination of the scope of an arbitration agreement *de novo*. *Id.* at 846.

■ The arbitration clauses in the three Customer Agreements all read as follows

Unless unenforceable due to federal or state law, any controversy arising out of or relating to my account, to transactions with you for me or this authorization or the breach thereof, shall be settled by arbitration in accordance with the rule, then in effect, of the National Association of Securities Dealers, Inc. or the Boards of Directors of the New York Stock Exchange, Inc. and/or the American Stock Exchange, Inc. as I may elect, and shall be governed by the laws of the State of New York.

In determining the scope of this clause, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The scope of the arbitration clause implicates the intent of the parties, but doubts regarding that intent must also be resolved in favor of arbitrability. *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 831 (2d Cir.1988). Again, when the contract contains a "broad" arbitration clause, as the one at issue here, that purports "to refer all disputes arising out of a contract to arbitration," the strong presumption in favor of arbitrability applies with even greater force. *Id.* at 832, (*citing AT & T Technologies*, 475 U.S. at 650, 106 S.Ct. at 1419).

■ Here the trustee's allegation that Shearson churned HMK accounts clearly arises out of or relates to the HMK account. The arbitration clause does not limit claims to tort or contract. Rather, given that the arbitration clause in each of the Customer Agreements states that all controversies "arising out of or relating to" the accounts are arbitrable, the churning

allegation does "touch matters" covered by these Agreements. *Genesco*, 815 F.2d at 846; *citing Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth Inc.*, 473 U.S. 614, 624 n. 13, 105 S.Ct. 3346, 3352 n. 13, 87 L.Ed.2d 444 (1985); *Hays & Co.*, 885 F.2d at 1153–54 (trustee in bankruptcy for corporation who brought churning claim was bound to arbitration by customer agreement with arbitration clause employing language indistinguishable from that in this case). As a consequence, summary judgment dismissing this claim as time-barred was improperly granted.

### III Waiver

Finally, Shearson asserts that the trustee waived his rights to arbitration through delay and by obtaining pretrial discovery from the other federal actions. Shearson reasons that because the trustee has retained the same counsel as the noteholders who brought the federal actions, he therefore has access through counsel to substantially all the discovery obtained in these prior federal cases. In addition, Shearson argues, the trustee knew of the arbitration provision in the contract as early as 1985, but failed to file a demand for arbitration until over three years later.

In his first proposed ruling, the magistrate found that matters of estate administration, as well as a dispute over whether the trustee's counsel had a conflict of interest, contributed to and basically accounted for the three-year delay. The magistrate also noted that all of the pretrial discovery and merits litigation at issue occurred during the cases the noteholders brought, and that the trustee's claims, while overlapping, are distinct from those cases. We agree with these conclusions.

██ Delay due to litigation of issues going to the merits rises to the level of waiver in some instances. *See Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir.1985). Yet, in light of the strong federal policy favoring enforcement of agreements to arbitrate disputes, waiver through participation in previous litigation may be found only when the party seeking to avoid arbitration is able to demonstrate some re-

sulting prejudice. In *Rush*, where the defendants participated in eight months of litigation, took extensive discovery, and brought a motion to dismiss before invoking the arbitration clause, we held there was no waiver because the expense and delay of eight months of litigation was not sufficiently prejudicial.

██ In this case, the participation in discovery is more attenuated—only present because two parties hired the same counsel. The trustee certainly cannot be held to account for the expense of discovery or the time spent in litigation in a matter brought by a different party, involving legally distinct claims. In effect, Shearson's arguments are based on the assumption that the trustee and the noteholders are one and the same. Yet, as was critical to our holding regarding standing, legally they are not the same parties and do not present the same claims. Consequently, there is no prejudice to Shearson demonstrated from any action taken by the *trustee*, and we are left only with the fact that the trustee delayed seeking arbitration for more than three years. But delay standing alone is an insufficient basis to support waiver. Under these circumstances, the right to arbitration has not been waived.

### CONCLUSION

The order of the district court granting summary judgement is affirmed in part, and reversed in part, and the claim of churning is remanded to the district court *for further proceedings consistent with this opinion.*