In re SHARP INTERNATIONAL CORP. and Sharp Sales Corp., Debtors.

Sharp International Corp., Plaintiff,

v.

KPMG LLP, Defendant.

Bankruptcy Nos. 99–21317–608, 99–23347–608.
Adversary No. 01–1439–608.

United States Bankruptcy Court, E.D. New York.

May 20, 2002.

Friedman, Wang & Bleiberg, P.C., New York City, for plaintiff.

Willkie Farr & Gallagher, New York City, for defendant.

## OPINION

CARLA E. CRAIG, Bankruptcy Judge.

This matter comes before the court on the motion of KPMG LLP ("KPMG" or "defendant") to dismiss this adversary proceeding, commenced by Sharp International Corp. ("Sharp" or "debtor"), for failure to state a claim upon which relief may be granted.

KPMG performed audits of, and issued reports with respect to, Sharp's financial statements for the fiscal years ending March 31, 1997 and March 31, 1998. (Complaint Doc. 1, ¶¶ 28, 33.) [1] Sharp charges KPMG with negligence, gross negligence, and recklessness, asserting that KPMG failed to conduct the 1997 and 1998 audits of Sharp in accordance with generally accepted auditing standards ("GAAS"), and failed to detect that Sharp's financial reporting was not in conformity with generally accepted accounting principles ("GAAP"). (Complaint ¶ 72.) Sharp alleges that as a result of KPMG's malpractice, the Spitzes were able to loot Sharp of more than $43 million, and seeks

1. "Doc." refers to documents listed on the     bankruptcy court's docket, by docket number.

to recover actual damages as well as punitive damages against KPMG. (Complaint ¶¶ 74–75, A.)

KPMG moves to dismiss Sharp's complaint pursuant to Fed.R.Civ.P. 12(b)(6), made applicable in this case by Fed. R.Bankr.P. 7012, contending that (1) Sharp's complaint does not allege a departure by KPMG from the generally accepted standards of practice, and (2) Sharp lacks standing to assert a claim for professional malpractice against KPMG. For the reasons set forth in this opinion, KPMG's motion is denied.

### Facts

The following is a summary of the relevant factual allegations of the complaint.

From 1961 until the sale of substantially all of its assets in July 2000, Sharp was engaged primarily in the business of importing and distributing wrist watches, clocks, pens and mechanical pencils. (Complaint ¶ 12.) In 1993, Bernard, Herbert and Lawrence Spitz (collectively, the "Spitzes") purchased 100% of Sharp's common stock from its former owners. (Complaint ¶ 13.) From 1993 until Sharp's bankruptcy filing on October 4, 1999, the Spitzes served as Sharp's Chief Executive Officer, President and Chief Financial Officer, with responsibility over Sharp's day-to-day affairs. (Complaint ¶ 13.)

In January 1995, the Spitzes sold 13% of Sharp's common stock to Bohorodzaner, Inc. (Complaint ¶ 14.) The Stock Purchase Agreement and Shareholder Agreement executed by Sharp and the Spitzes in connection with this sale gave Bohorodzaner, Inc. a seat on Sharp's Board of Directors; the right to inspect Sharp's books and records at any time, and to receive audited financial statements each year and unaudited financial statements each month; the right to veto a wide array of corporate transactions; and a variety of other corporate governance rights. (Complaint ¶ 14.) From January 1995 to October 1999, the principal of Bohorodzaner, Inc., Jaime Bohorodzaner, served as a member of Sharp's Board of Directors. (Complaint ¶ 14.) Mr. Bohorodzaner also served as a consultant to Sharp, regularly visited Sharp's offices, and regularly received and reviewed Sharp's financial statements. (Complaint ¶ 14.) Neither Bohorodzaner, Inc. nor Mr. Bohorodzaner played any role in, or had knowledge of, the fraud and embezzlement committed by the Spitzes, because the Spitzes actively concealed their fraud from them. (Complaint ¶ 14.)

In or about the fall of 1997, Sharp solicited a group of institutional investors, consisting of The Equitable Life Assurance Society of the United States, Albion Alliance Mezzanine Fund, L.P., Alliance Investment Opportunities Fund LLC, Massachusetts Mutual Life Insurance Company, Travelers Insurance Company, and certain of their affiliates (collectively, "Noteholders"), to provide debt financing to Sharp. (Complaint ¶ 20.) Although Sharp's fiscal 1997 financial statements were previously audited by Billet Feit & Preis ("Billet Feit"), a small private accounting firm, which provided an unqualified audit opinion, the Noteholders required Sharp to engage a nationally recognized accounting firm to conduct an independent reaudit of Sharp's financial statements for fiscal 1997 in connection with the proposed purchase of notes from Sharp. (Complaint ¶¶ 22–23.) Sharp accordingly retained KPMG to reaudit Sharp's financial statements for fiscal 1997. (Complaint ¶ 23–24.) In KPMG's retention agreement with Sharp, dated January 13, 1998, KPMG acknowledged that KPMG "will conduct the audit in accordance with generally accepted auditing standards with the objective of express-

ing an opinion as to whether the presentation of the financial statements, taken as a whole, conforms with generally accounting principles." (Complaint ¶ 25.) By the same letter, KPMG also acknowledged that its "audit is planned and performed to obtain reasonable assurance about whether [Sharp's] financial statements are free of material misstatement, whether caused by error or fraud." (Complaint ¶ 26.)

By letter dated February 26, 1998, KPMG issued an unqualified audit opinion for Sharp's financial statements for fiscal 1997. (Complaint ¶ 28.) In this audit report, KPMG represented that Sharp's financial statements for fiscal 1997 were audited in accordance with GAAS and that they fairly presented, in all material respects, the financial position of Sharp as of March 31, 1997, in conformity with GAAP. (Complaint, ¶ 28.) Sharp continued KPMG's retention, and on June 19, 1998, KPMG issued another unqualified audit opinion representing that Sharp's financial statements for fiscal 1998 were audited in accordance with GAAS and that they fairly presented, in all material respects, the financial position of Sharp as of March 31, 1998, in conformity with GAAP. (Complaint ¶ 33.)

However, the financial statements for fiscal 1997 and 1998 did not present fairly, in all material respects, the financial position of Sharp for the period under audit in conformity with GAAP. (Complaint ¶¶ 29, 34.) Beginning prior to 1997 and continuing through October 1999, the Spitzes perpetrated massive fraud on Sharp and its creditors that KPMG failed to detect until the middle of 1999. (Complaint ¶¶ 15, 39.) The Spitzes falsely inflated Sharp's sales and revenue and supported these inflated figures by fabricating fictitious model numbers in inventory, by forging invoices, and by creating fictitious records of sales to both real and nonexistent customers. (Complaint ¶ 15.) The fraud proceeded to the extent that fraudulent or nonexistent transactions comprised three quarters of the accounts receivable balance included in Sharp's financial statements for the fiscal years of 1997, 1998 and 1999. (Complaint ¶ 16.) Through manipulations of this sort, the Spitzes caused Sharp to falsely report that its net sales were $52.1 million in fiscal 1997, when its actual sales were approximately $24 million; $80.2 million in fiscal 1998 when its actual sales were approximately $21 million; and $118.1 million in fiscal 1999 when its actual sales were approximately $19 million. (Complaint ¶ 17.) Using these inflated figures, the Spitzes caused Sharp to raise large sums of money from lenders and investors. (Complaint ¶ 18.) The Spitzes looted Sharp of the monies they caused it to fraudulently raise, and of additional monies as well. (Complaint ¶ 19.) They did so by diverting more than $44 million of Sharp funds to a variety of companies in 1998 and 1999—most of which were owned by or affiliated with the Spitzes—that provided no goods, services or other consideration to Sharp. (Complaint ¶ 19.)

On July 1, 1999, KPMG withdrew its prior unqualified audit opinions of Sharp's financial statements for fiscal 1997 and 1998, refused to issue an audit opinion with respect to fiscal 1999 and terminated its engagement with Sharp. (Complaint ¶ 41.)

On September 7, 1999, the Noteholders filed an involuntary petition under chapter 11 of the Bankruptcy Code against Sharp. (Complaint ¶ 8.) An order for relief was entered on October 4, 1999 with Sharp's consent, and this Court appointed FTI/Kahn Consulting, Inc. ("Kahn") as responsible officer of Sharp, with full power to manage Sharp's business, financial and legal affairs during the chapter 11 case, removing the Spitzes from the operation of

the business. (Complaint ¶ 8.) Under Kahn's management, Sharp continued to operate its business and manage its assets as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code until October 2, 2001, on which date a chapter 11 trustee was appointed.

### Standard for Motion to Dismiss

█ KPMG's motion to dismiss is governed by Fed.R.Civ.P. 12(b)(6), made applicable in bankruptcy proceedings by Fed. R.Bankr.P. 7012. A complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When determining the sufficiency of the plaintiff's claim, the court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001) (*citing Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir. 2000)).

█ The court's consideration is limited to the assertions made within the four corners of the complaint, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit. *Gregory*, 243 F.3d at 691; *Brass v. American Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir.1993). "In short, the function of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Amalgamated Bank of New York v. Marsh*, 823 F.Supp. 209, 215 (S.D.N.Y.1993) (citations omitted).

### Discussion

█ In this adversary proceeding, Sharp asserts malpractice claims against KPMG, contending that KPMG's failure to conduct its 1997 and 1998 audits of Sharp's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS") constituted negligence, gross negligence or recklessness, and that if the audits had been properly conducted, the Spitzes' fraud would have been detected and further losses to Sharp would have been averted. KPMG moves to dismiss Sharp's complaint, contending that (1) the complaint does not allege a departure by KPMG from the generally accepted standards of practice, and (2) Sharp lacks standing to assert a claim for professional malpractice against KPMG.

### I. *Adequacy of Sharp's Allegations of Malpractice*

█ Generally Accepted Auditing Standards, promulgated by the American Institute of Certified Public Accountants (AICPA), are the accepted standards of practice for auditors. *United States v. Arthur Young & Co.*, 465 U.S. 805, 811, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984); *Bankruptcy Serv., Inc. v. Ernst & Young LLP (In re CBI Holding Co., Inc.)*, 247 B.R. 341, 362 (Bankr.S.D.N.Y.2000). An accountant's good faith compliance with GAAS and generally accepted accounting principles ("GAAP") discharges the accountant's professional obligation to act with reasonable care. *CBI Holding*, 247 B.R. at 362. The independent auditor examines the corporation's books and records and determines whether the financial reports of the corporation have been prepared in accordance with GAAP, which consists of the conventions, rules, and accepted accounting practices promulgated by the accounting profession's Financial

Accounting Standards Board. *Arthur Young*, 465 U.S. at 811, 811 fn. 7, 104 S.Ct. 1495. The auditor then issues an opinion stating whether the financial statements, taken as a whole, fairly represent the financial position and operations of the corporation for the relevant period. *Id.* at 811, 104 S.Ct. 1495. The most favorable report that an auditor may give is an unqualified opinion, which represents the auditor's finding that the company's financial statements present fairly, in all material respects, the financial position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with GAAP. *Id.* at 819 fn. 13, 104 S.Ct. 1495; *AICPA Professional Standards*, AU § 508.10 (as of June 1, 1998). KPMG issued unqualified audit opinions for Sharp for fiscal 1997 and 1998.

Sharp argues that KPMG's negligence and recklessness in failing to uncover and disclose Sharp's true financial condition constituted an extreme departure from GAAS. (Complaint ¶ 44.) Pursuant to GAAS, "[t]he auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." *AICPA Professional Standards*, AU § 316.01 (as of June 1, 1998). Among other things, KPMG allegedly failed to gather sufficient competent evidential matter to support the financial statements, its audit reports, and its unqualified opinions regarding Sharp's financial statements, and KPMG also allegedly failed to exercise the requisite skepticism throughout the auditing process. (Complaint ¶ 45); *see Togut v. Arthur Andersen & Co. (In re Mid–Atlantic Fund, Inc.)*, 39 B.R. 88, 90 (S.D.N.Y.1984) (finding bankruptcy trustee's allegations that the accountant violated GAAS by failing to adequately investigate or obtain sufficient underlying documentation to determine the accuracy of the financial statements, and that the accountant violated GAAP by incorporating inflated values of the assets in the financial statements, were sufficient to defeat a motion to dismiss).

This Court finds that Sharp has adequately alleged that KPMG failed to adhere to GAAS in its audits of Sharp. For example, Sharp alleges that in conducting its audits, KPMG failed adequately to verify Sharp's accounts receivable by confirming only three accounts receivable, all of which had previously been confirmed by Sharp's prior auditor (Complaint ¶ 48); failed to verify independently the addresses provided by Sharp of the customers to which KPMG sent accounts receivable confirmations (Complaint ¶ 49); failed to detect or investigate discrepancies between the customers list and the vendors list (Complaint ¶ 50); failed to notice inconsistency in Sharp's accounts receivable aging schedule (Complaint ¶ 51); failed to examine adequately Sharp's "sales" invoices (Complaint ¶ 52); and failed adequately to verify, corroborate or confirm Sharp's representations regarding the alleged rapid growth of its accounts receivable. (Complaint ¶ 53).

Furthermore, Sharp alleges that KPMG violated GAAP in conducting the 1997 and 1998 audits because it failed to perform sufficient tests of the inventory reported in Sharp's financial statements and, as a result, failed to detect the enormous disparity between Sharp's reported and actual inventory. (Complaint ¶ 54.) In connection with the testing of the inventory, Sharp alleges that KPMG failed to select and test an adequate number of inventory samples (Complaint ¶ 55); that KPMG failed to select a statistically significant sample to adequately test the chain of evidence and intervening transactions (Complaint ¶ 55); that KPMG's inventory

samples were not representative of Sharp's overall inventory population (Complaint ¶ 56); and that KPMG's inventory price tests failed to account for import costs, which were particularly significant since virtually all of Sharp's inventory was imported from Asia. (Complaint ¶ 57).

In addition, Sharp contends that KPMG's failure to gain sufficient understanding of Sharp's internal control structure violated GAAS. (Complaint ¶ 58). In connection with KPMG's review of Sharp's internal controls, KPMG allegedly obtained information only from the Spitz brothers and two other employees, and failed to interview other employees who held key positions with regard to matters encompassed by the audit (Complaint ¶ 59); failed to test Sharp's accounts payable and purchases cycles (Complaint ¶ 60); failed to assess Sharp's segregation of duties (Complaint ¶ 62); and failed to utilize an approach that relied more on KPMG's independent testing rather than on Sharp's weak internal controls. (Complaint ¶ 63).

Accordingly, to the extent that KPMG seeks dismissal of the complaint for failure to allege a departure from generally accepted standards of auditing practice, the motion is denied.

## II. *Standing*

█ "[S]tanding is jurisdictional under Article III of the United States Constitution ... putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court." *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 117 (2d Cir.1991). The doctrine of standing is derived from the limitation of the judicial power of the federal courts to determining cases or controversies, and incorporates both constitutional and prudential limitations on federal jurisdiction. *Wight v. BankAmerica Corp.,* 219 F.3d 79, 86 (2d Cir.2000); *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1091 (2d Cir.1995); *Wagoner,* 944 F.2d at 118. A party seeking to invoke federal jurisdiction must have at least a "personal stake in the outcome of the controversy" to meet the "case or controversy" requirement of the Constitution. *Wight,* 219 F.3d at 86; *Wagoner,* 944 F.2d at 118. Furthermore, the party must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties" to meet the prudential requirement of standing. *Wight,* 219 F.3d at 86; *Wagoner,* 944 F.2d at 118; *Hirsch,* 72 F.3d at 1091.

█ "The 'case and controversy' requirement coincides with the scope of the powers the Bankruptcy Code gives a trustee, that is, if a trustee has no power to assert a claim because it is not one belonging to the bankruptcy estate, then he also fails to meet the prudential limitation that the legal rights asserted must be his own." *Wagoner,* 944 F.2d at 118; *Hirsch,* 72 F.3d at 1091. "Under the Bankruptcy Code the trustee stands in the shoes of the bankrupt corporation, and he has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy." *Wagoner,* 944 F.2d at 118; *Hirsch,* 72 F.3d at 1093. "It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Wagoner,* 944 F.2d at 118.

█ Where, as in this case, a trustee seeks to assert a claim against the debtor's former professionals or other third parties, the trustee's standing is circumscribed by the rule enunciated in *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir.1991). *Wagoner* held that "[a] claim against a third party for defrauding a cor-

poration with the cooperation of management accrues to creditors, not to the guilty corporation." *Wagoner*, 944 F.2d at 120; *Hirsch*, 72 F.3d at 1094 (finding that the trustee lacked standing to assert professional malpractice claims against third parties because of the "debtor's collaboration with the [defendants] in promulgating and promoting the [fraud]"). The *Wagoner* rule is based on principles of agency law:

> The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it.... Underlying the rule is the presumption that an agent has discharged his duty to disclose to his principal "all the material facts coming to his knowledge with reference to the subject of his agency."

*Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 488 N.E.2d 828 (1985).

Thus, the *Wagoner* rule imputes the misconduct and knowledge of the corrupt management to the corporation, if the management was acting within the scope of employment. Since the trustee stands in the shoes of the corporation, it follows that the trustee is barred from suing to recover for a wrong that the corporation took part in. *Wight*, 219 F.3d at 86.

In *Wagoner*, the individual who looted the corporation was the corporation's sole stockholder, director, and president. *Wagoner*, 944 F.2d at 120. However, lower courts have found that the applicability of the *Wagoner* rule is not limited to situations where the fraud was committed by a corporation's sole shareholder and director, but also extends to situations where there are multiple officers and directors. *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 212 B.R. 34, 36 (S.D.N.Y.1997) ("the *Wagoner* rule only applies where *all* relevant shareholders and/or decision-makers are involved in the fraud") (emphasis in original). Under *Wechsler's* expanded interpretation of *Wagoner*, management's fraudulent conduct and knowledge will not be imputed to the corporation if the complaint alleges that there was at least one innocent member of management who could or would have been able to prevent the fraud had he known about it. *Wechsler*, 212 B.R. at 36; *see CBI Holding*, 247 B.R. at 364–65 (finding, after trial on the merits, that a corporation, whose management was involved in an accounting fraud, was not barred from asserting claims for professional malpractice for failure to detect fraud, where the corporation had at least one decision-maker in management or among its stockholders who was innocent of the fraud and could have stopped it).

Even if the *Wagoner* rule applies, a trustee may have standing to assert a claim against the corporation's third party professionals under the adverse interest exception to that rule. The adverse interest exception applies where "the officer acted entirely in his own interests and adversely to the interests of the corporation." *Wight*, 219 F.3d at 87; *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir.1997); *CBI Holding*, 247 B.R. at 365. "The theory is that 'where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside of the scope of his agency, and it would be most unjust to charge the principal with knowledge of it.'" *Wight*, 219 F.3d at 87 (*citing Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir.1936)). The adverse interest exception rebuts the presumption that the agent has properly discharged his duty of disclosure to the principal since "[the agent] cannot be presumed to have disclosed that which

would expose and defeat his fraudulent purpose." *Center,* 66 N.Y.2d at 784, 497 N.Y.S.2d 898, 488 N.E.2d 828; *CEPA Consulting, Ltd. v. King Main Hurdman (In re Wedtech Sec. Litig.),* 138 B.R. 5, 9 (S.D.N.Y.1992). However, the adverse interest exception applies only when the agent has "totally abandoned" the principal's interests. *Wight,* 219 F.3d at 87; *Mediators,* 105 F.3d at 827; *Wedtech,* 138 B.R. at 9.

■ The adverse interest exception, in turn, is subject to the sole actor rule, which, if applicable, invokes the *Wagoner* rule even if the management acted adversely to the interests of the corporation. The sole actor rule applies "where the principal and agent are one and the same," and precludes the trustee from raising the adverse interest exception as a defense, because "notwithstanding the agent's self-dealing ... the party that should have been informed was the agent itself albeit in its capacity as principal." *Mediators,* 105 F.3d at 827.

### A. *Applicability of the Sole Actor Rule*

■ Sharp takes the position that even if the Spitzes' fraudulent conduct were imputed to Sharp by operation of the *Wagoner* rule, Sharp would still have standing to maintain this action against KPMG because the facts of this case fit within the adverse interest exception to the *Wagoner* rule. KPMG takes the position that, even if the Spitzes' fraud falls within the adverse interest exception, the *Wagoner* rule is invoked because of the sole actor exception to the adverse interest exception to that rule.

Some courts considering the applicability of the sole actor rule on a motion to dismiss have looked to the complaint to see whether the plaintiff has alleged that there was an innocent member of management or shareholder who could or would have prevented the fraud had he known about it. *E.g., SIPC v. BDO Seidman, LLP,* 49 F.Supp.2d 644, 651 (S.D.N.Y.1999) (finding allegation that "no evidence exists that all employees of [the debtor] were party to the fraudulent or criminal activity" insufficient). Here, the complaint contains allegations sufficient to avoid the application of the sole actor rule on a motion to dismiss. Sharp alleges that at all times since 1995, Sharp had an innocent 13% shareholder, Bohorodzaner Inc., as well as an innocent director, Jaime Bohorodzaner. (Complaint ¶ 14.) Sharp further alleges that Bohorodzaner Inc. possessed a broad array of corporate governance rights, including the right to inspect Sharp's books and records, to receive audited and unaudited financial statements, and to veto various corporate transactions. (Complaint ¶ 14.) Moreover, according to Sharp, Jaime Bohorodzaner served at all pertinent times as a member of Sharp's board of directors, served as a consultant to Sharp, regularly visited Sharp's offices, and regularly received and reviewed Sharp financial statements. (Complaint ¶ 14.)

■ The conclusion that the complaint contains allegations sufficient to withstand a motion to dismiss is supported by *Wight v. BankAmerica Corp.,* 219 F.3d 79 (2d Cir.2000). Plaintiffs in *Wight* were the liquidators of Bank of Credit and Commerce International ("BCCI"), which led a "short, swashbuckling life" before collapsing amid allegations of fraud. *Id.* at 81. BCCI's liquidators sued one of BCCI's correspondent banks for aiding and abetting one of the managers' fraudulent schemes. Defendants argued that the adverse interest exception did not operate to abrogate the *Wagoner* rule, because the complaint also alleged that the corporation was "*dominated* by corrupt prior senior managers and directors," which, they argued, invoked the sole actor rule.

*Wight,* 219 F.3d at 87 (emphasis in original). Noting that on a motion to dismiss, the complaint must be construed in the plaintiff's favor, the Second Circuit credited as true the plaintiffs' allegation that "BCCI was adversely dominated by corrupt [management], who act[ed] in their own interests and not in the interests of BCCI ..." and found that this allegation precluded the dismissal of the complaint under *Wagoner. Id.* In sustaining the sufficiency of the complaint, the court did not consider whether the liquidators of BCCI had pled facts showing the existence of an innocent member of management who would have prevented the fraud if it had been disclosed. Thus, *Wight* stands for the proposition that on a motion to dismiss, an allegation of adverse interest should be credited as true, and that the "key 'question of whether the guilt of the corporate officers can be imputed to the corporation'" should be decided on an evidentiary record and not disposed of on the pleadings. *Id.*

The *Wight* court's determination that the sufficiency of allegations of standing under the *Wagoner* rule should be measured against the ordinary notice pleading requirements of Fed.R.Civ.P. 8(a), rather than any heightened standard that would require the pleading of particular facts demonstrating the plaintiff's standing, is supported by the Supreme Court's recent decision in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 995, 152 L.Ed.2d 1 (2002). There, the Court unanimously reversed a line of court of appeals cases which required plaintiffs in employment discrimination cases to plead facts constituting a prima facie case of discrimination. To impose such a heightened pleading requirement, the Court held, conflicts with Fed.R.Civ.P. 8(a), which requires only notice pleading in civil actions, subject to limited exceptions, such as the exception created by Fed.R.Civ.P. 9(b).

Therefore, to the extent that KPMG seeks dismissal of the complaint based on a contention that Sharp has not pleaded specific facts demonstrating standing under the *Wagoner* rule, its motion must be denied.

KPMG takes the position that, by alleging the existence of only three corporate officers, the Spitz brothers, and alleging that the Spitzes ran the company and had control over the fraudulent transactions, the complaint on its face invokes the sole actor rule. (Doc. 10 at 6.) In support of this argument, KPMG relies upon *Breeden v. Kirkpatrick & Lockhart L.L.P.,* 268 B.R. 704, 710 (S.D.N.Y.2001). In *Breeden,* the court noted that the *Wechsler* decision held that the "Wagoner rule only applies where *all* relevant shareholders and/or decision-makers are involved in the fraud," and interpreted this language to mean that "some members of management are irrelevant for the purposes of applying the *Wagoner* rule." *Breeden,* 268 B.R. at 710. At the same time, however, the *Breeden* court acknowledged that "the presence of a person with the ability to bring an end to the fraudulent activity at issue would demonstrate that principal and agent are distinct entities and that the total control necessary for an application of the *Wagoner* rule is not present." *Id.* The court went on to find that as a factual matter, the trustee failed "to offer evidence that such a relevant innocent decision-maker existed at [the debtor]," and granted judgment to defendants. *Id.*

Thus, in *Breeden,* the issue of standing was decided after a hearing, on a fully developed evidentiary record. *Breeden,* 268 B.R. at 710. By contrast, there has been no discovery or evidentiary hearing in the present action, which comes before this Court on a pre-answer motion to dismiss. In this context, the complaint must be construed liberally and inferences must be drawn from the allegations in the com-

plaint in the light most favorable to plaintiff. *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001). Under this standard, Sharp's allegation that, during the relevant periods, there was an innocent 13% shareholder who served on Sharp's board of directors, served as a consultant to Sharp, regularly visited Sharp's offices, and regularly received and reviewed financial statements (Complaint ¶ 14), must be construed as alleging "the presence of a person with the ability to bring an end to the fraudulent activity at issue," and is sufficient to defeat KPMG's motion to dismiss. *Breeden*, 268 B.R. at 710.

B. *Applicability of the Adverse Interest Exception*

■ Sharp has sufficiently alleged that there is an adversity of interests between Sharp and the Spitzes to trigger the adverse interest exception. The Spitzes clearly acted entirely in their own interests and to the detriment of Sharp by diverting more than $43 million of Sharp funds to a variety of companies that provided no goods or services to Sharp. (Complaint ¶ 19.) The fact that Sharp suffered actual damages as a result of the Spitzes' misconduct is not speculative. In November 2000, this Court entered a judgment in the amount of $44,378,650.30 against the Spitzes and three of their companies, jointly and severally, for conversion, breach of fiduciary duty and related claims. (Complaint ¶ 19.) This judgment remains wholly unsatisfied. (Complaint ¶ 19.)

KPMG contends that, not withstanding these allegations, the adverse interest exception does not apply, because the Spitzes turned Sharp into an "engine of theft" against outsiders, including the Noteholders and other outside lenders. (Doc. 6 at 8.) The intellectual underpinning of this argument, according to KPMG, is *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir.1982). There, the Seventh Circuit, applying Illinois law, and after a jury trial, refused to permit a corporation to recover against its auditors for breach of contract, negligence and fraud in failing to prevent a fraud perpetrated by the corporation's former management. In imputing the managers' fraud to the corporation, the court noted that the managers in question "are not stealing from the company—that is, from its current stockholders—but instead are turning the company into an engine of theft against outsiders—creditors, prospective stockholders, insurers, etc." *Id.* at 454. The court contrasted that scenario with the facts presented in a case cited by Cenco, *Leeds Estate Bldg. & Inv. Co. v. Shepherd*, 36 (L.R.) Ch. D. 797, 802, 809 (1887), in which a manager, "by misrepresenting the profits of the company, had caused the company to pay out dividends, directors' fees, and bonuses for himself ... as a result of which the company went broke." This, the court pointed out, "was stealing from, not for, the company." *Id.* at 455.

A close examination of the facts of *Cenco* reveals a critical distinction from the facts alleged by Sharp in this action. In *Cenco*, the corrupt managers (who were shareholders of the company) "aggrandiz[ed] ... themselves" by manipulating the value of the company's stock, rather than by looting the company. Their fraudulent scheme consisted of inflating the company's inventories in one division "far above their actual value," which

> increased the apparent worth of Cenco and greatly increased the market price of its stock.... The inflated stock was used to buy up other companies on the cheap. Cenco further benefitted from the fraud by being able to borrow money at lower rates than if its inventories had been honestly stated and by getting insurers to pay inflated claims for inventory lost or destroyed.... *Thus, those*

*involved in the fraud were not stealing from the company, as in the usual corporate fraud case, but were instead aggrandizing the company (and themselves) at the expense of outsiders,* such as the owners of the companies that Cenco bought with its inflated stock, the banks that loaned Cenco money, and the insurance companies that insured its inventories.

*Id.* at 451 (emphasis added).

Here, there is no question that the Spitzes were stealing from Sharp. KPMG argues that this fact is irrelevant because "[w]here the agent in the first instance steals *for* a principal, as here, the agent has not 'totally abandoned' the principal's interests, and the agent's wrongdoing knowledge is imputed to the principal." (Doc. 10 at 10.) Thus, according to KPMG, under the *Wagoner* rule, the presence of fraud directed against outsiders disables a trustee from recovering for an auditor's negligent failure to detect fraud perpetrated against the corporation itself.

There are several problems with this argument. First, and most importantly, this new exception that KPMG seeks to engraft upon the adverse interest exception to the *Wagoner* rule is unsupported by Second Circuit precedent and directly conflicts with that court's holding in *Wight*. There, the Second Circuit found that the applicability of the adverse interest exception was adequately alleged, notwithstanding the fact that BCCI's corrupt managers engaged in a fraud directed against outsiders. KPMG either overlooks or ignores this aspect of the underlying facts of *Wight*, asserting that the fraud in that case did not involve "fraudulently raising money from outsiders," but rather consisted of "use of a complex series of loan transactions to 'funnel money' out of the corporation into accounts controlled by individuals cooperating with the wrongdoing

executives." (Doc. 10 at 8, fn. 8.) However, the funds which were funneled to the wrongdoers in *Wight* were fraudulently obtained from depositors. Indeed, BCCI pled guilty to an indictment alleging that it and its affiliates

made false and fraudulent pretenses, representations and promises as to ... the financial condition. net worth, and capital of the member entities of [BCCI], and the ability of [BCCI] to repay creditors. . . . The essence of the scheme was to convince depositors ... by means of false pretenses ... that [BCCI] was a safe financial repository and institution for funds.

*Wight,* 219 F.3d at 81–82.

The defendants argued that this guilty plea precluded the liquidators of BCCI from invoking the adverse interest exception to the *Wagoner* rule, because, by causing BCCI to plead guilty, the liquidators acknowledged that the wrongdoing managers were acting in the interests of BCCI. The Second Circuit rejected this argument, holding that, even if the corrupt managers were acting in BCCI's interests in fraudulently inducing various financial institutions to deposit monies with BCCI, this does not necessarily mean that the managers were acting in BCCI's interests in perpetrating the fraud which the defendants were accused of aiding and abetting, which was a scheme to funnel money from BCCI to a Pakistani shipping group through a series of conduit companies.

Thus, in *Wight,* the Second Circuit considered and rejected the argument now made by KPMG in its attempt to invoke, on the facts alleged in the complaint, an "engine of theft" exception to the adverse interest exception to the *Wagoner* rule. Under *Wight,* a liquidator (in this case, a trustee) is not precluded from invoking the adverse interest exception with respect to managers' conduct that is adverse to the

corporation's interest, such as funneling money out of the company, because the managers have funded their looting in whole or in part through fraud that is not adverse to the corporation's interest, such as fraudulently inducing outsiders to invest.

Moreover, KPMG's proposed "engine of theft" doctrine—that the presence of fraud directed against outsiders disables the trustee from invoking the adverse interest exception with respect to fraud that was perpetrated against the corporation—finds no support in any Second Circuit cases. In *Mediators*, *Hirsch*, and *Wagoner*, the court found a lack of standing, but based on the sole actor rule: in each of those cases the wrongdoing managers were also the sole shareholders, or all the general partners, of the debtor. *Mediators*, 105 F.3d at 826 (finding that the sole actor rule precluded the creditors' committee, standing in the debtor's shoes, from pursuing an aiding and abetting claim because the primary wrongdoer was the debtor's sole shareholder, whose knowledge must be imputed to the debtor); *Hirsch*, 72 F.3d at 1094 (finding that the trustee lacked standing because both of the debtor's general partners collaborated with the defendants in promulgating and promoting the Ponzi scheme); *Wagoner*, 944 F.2d at 120 (finding that the trustee lacked standing to assert a claim against a third party for defrauding a corporation because the corporation's sole stockholder and decision-maker actively cooperated in the fraud).

Instead of supporting this argument with Second Circuit authority, KPMG cites cases from other jurisdictions. *See Seidman v. Gee*, 625 So.2d 1 (Fla.Dist.Ct. App.1992); *Security America Corp. v.*

*Schacht*, No. 82C2132, 1983 U.S.Dist. LEXIS 19621 at *1, (N.D.Ill. January 31, 1983). In *Gee*, the court found that the corrupt management did not inflict "real damage" to the corporation, because the corporation was turned into an "engine of theft." *Id.* at 3. Similarly, in *Schacht*, 1983 U.S.Dist. LEXIS 19621 at *4, the court found that because the corporation had "no assets except those it acquired along the way, pursuant to the fraudulent plan," that any alleged injury to the plaintiff corporation was illusory. *Id.*

Relying on these cases, KPMG argues that Sharp was not damaged by the Spitzes' fraud. However, the facts alleged in this case are different from *Schacht* and *Gee*. The Spitzes are alleged to have looted monies over and above the sums they caused Sharp to fraudulently raise. (Complaint ¶ 19.) This allegation must be credited as true on a motion to dismiss. *Wight*, 219 F.3d at 87. Moreover, the specific facts pleaded by Sharp in this proceeding and in its action against State Street Bank are consistent with this claim. In 1998, when Sharp first raised monies through the issuance and sale of subordinated notes to the Noteholders, Sharp owed $26 million under a line of credit from State Street Bank. (Complaint filed in *Sharp International Corporation v. State Street Bank and Trust Co.*, Adv. Proc. No. 01–1217–608, dated May 30, 2001 ("State Street Complaint"), ¶ 19.)[2] Of the $17.5 million raised from the Noteholders in July, 1998, $11 million was used to reduce Sharp's indebtedness to State Street to $15 million. (Complaint ¶ 18; State Street Complaint ¶ 19.) In 1999, the Noteholders purchased an additional $25 million of subordinated notes from Sharp, of which $12 million was used to repay

---

**2.** This Court may take judicial notice of allegations set forth in Sharp's complaint in its adversary proceeding against State Street Bank. *Marden v. Dinin*, 22 F.Supp.2d 180,

183, n. 2 (S.D.N.Y.1998) ("A court may take judicial notice of related judicial proceedings").

State Street. (Complaint ¶ 18.) Thus, of the $42.5 million raised from the Noteholders, $23 million was used to repay State Street. The complaint alleges that the Spitzes diverted more than $43 million from Sharp. (Complaint ¶ 19.) This pleading is sufficient to rebut any argument on a motion to dismiss that Sharp was a mere "engine of theft," because the Spitzes are alleged to have diverted substantially more than the funds fraudulently raised from the Noteholders.

The final point to be addressed is KPMG's assertion that the Spitz brothers, as Sharp's stockholders, could potentially benefit from any recovery obtained by Sharp in this adversary proceeding. Here again, KPMG relies upon *Cenco*, which, KPMG argues, pointed out that injustice would result from allowing recovery against third parties where the corrupt officers would benefit therefrom because of their status as stockholders of the corporation. *Cenco*, 686 F.2d at 455. This argument, pursued to its logical conclusion, would mean that the *Wagoner* rule is invoked whenever the wrongdoer owns *any* shares of the plaintiff corporation's stock. This proposition is not supported by *Wagoner* or any of its progeny. Moreover, on the undisputed facts of this case, this argument is a red herring. Given the magnitude of Sharp's debt, the value of its remaining assets, and the $44 million judgment that Sharp holds against the Spitzes, there is no real possibility that the Spitzes, as shareholders, would receive any portion of the proceeds of any judgment obtained by Sharp against KPMG. Nor should this issue be of concern as a matter of precedent, because, if such a problem were to arise in a bankruptcy case, it could be addressed in any number of ways, such as, for example, through disallowance or equitable subordination of the wrongdoer's claim or interest. *See, e.g., Pepper v. Litton*, 308 U.S. 295, 312, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (finding that an insider's claim was properly disallowed by the lower court where the insider used his strategic position for his preferment to the detriment of other creditors); *Le Cafe Creme, Ltd. v. Roux (In re Cafe Creme Ltd.)*, 244 B.R. 221, 235 (Bankr.S.D.N.Y.2000) (finding that insiders' conduct warranted equitable subordination where the insiders caused their loans to be repaid first to the detriment of the debtor's other creditors).

### Conclusion

For the reasons stated in this opinion, this Court finds that Sharp has sufficiently alleged that KPMG departed from generally accepted standards of practice in its auditing of Sharp, and that Sharp's trustee has standing to assert these claims against KPMG. Accordingly, KPMG's motion to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6) is denied. Sharp is directed to settle an order consistent with this opinion.