OPINION OF THE COURT
Charles E. Ramos, J.
Motion sequence numbers 010 and Oil are consolidated for disposition.
In motion sequence number 010, defendant Ernst & Young Cayman Islands (EYCI) moves to strike certain opinions submitted by the plaintiffs’ expert.
In motion sequence number Oil, EYCI moves for summary judgment (CPLR 3212) dismissing the remaining cause of action for negligence.
Background[1]
In August of 2002, Beacon Hill Master Ltd. (the Fund), a hedge fund organized under Cayman Islands law, sustained heavy trading losses and ultimately “imploded.” In 2004, the Grand Court of the Cayman Islands appointed plaintiffs Theo Bullmore and Phillip Stenger as the joint official liquidators (JOL) of the Fund, pending winding-up proceedings, to pursue claims on behalf of the Fund.
The Fund, which invested primarily in mortgage-backed securities, was formed in 1997 by defendant Beacon Hill Asset Management, LLC, and its principals, the four individual defendants John Barry, Thomas Daniels, John Irwin, and Mark Miszkiewicz, that acted as the Fund’s investment manager (together, the investment managers).
In early October of 2002, the investment managers advised the two independent directors of the Fund’s board, nonparties Don Seymour and Peter Young (directors), that the Fund had suffered the loss of nearly half of its net asset value (NAV).
Bear Stearns, the Fund’s broker, also learned of the Fund’s dramatically deteriorating financial condition around this time, and determined that it would discontinue financing to the Fund. On October 8, 2002, Bear Stearns alerted the Securities and *669 Exchange Commission (SEC) of the Fund’s condition (complaint 1183).
On November 7, 2002, the SEC commenced an action against the investment managers for securities fraud, based upon allegations that the Fund’s losses were precipitated by the fraudulent valuation methods that they employed. The investment managers denied any wrongdoing, but agreed to the entry of a consent judgment against them, and to step down as the Fund’s manager.
In March of 2005, the JOL commenced this action on behalf of the Fund against the investment managers, EYCI, and the Fund’s administrator, ATC Fund Services (Cayman) Limited (ATC).[2] The JOL allege that the investment managers fraudulently inflated the value of the securities held in the Fund’s portfolio, which ultimately led to the Fund’s collapse in late summer of that year, when growing and substantial losses could no longer be hidden by manipulative valuation.
All of the defendants have since settled with the JOL, with the exception of EYCI. It is the sole defendant in this action. EYCI was retained as the Fund’s auditor pursuant to an engagement letter, and conducted the Fund’s only audit based upon the period of time between January 2 and March 31, 2002. EYCI issued a “clean audit report.”
The complaint alleges that EYCI conducted a deficient audit by failing to perform the audit in accordance with generally accepted auditing standards. Additionally, the JOL allege that EYCI was negligent in failing to detect the investment managers’ fraudulent valuation and alert the directors, thereby causing the Fund’s losses.
Discussion
EYCI moves for summary judgment on the ground that the JOL are barred from asserting a claim against it for negligence, because the wrongful actions of the investment managers are imputed to the Fund based upon imputation principles and the defense of in pari delicto. Further, EYCI contends that the JOL *670 failed to demonstrate that EYCI proximately caused the Fund’s losses, because the ill-fated act that ultimately caused the Fund to implode was a poorly-timed bet on the direction of interest rates by the investment managers, made after EYCI issued its audit report.
The JOL contend that they are not barred from asserting a claim for negligence against EYCI, because they are seeking to recover damages to the Fund that will benefit innocent investors only, and not the ousted investment managers that perpetrated the alleged fraud. The JOL principally rely on Williamson v PricewaterhouseCoopers LLP (Sup Ct, NY County, Nov. 7, 2007, Moskowitz, J, index No. 602106/06, mot sequence No. 011 [WilliamsonJ).
Moreover, the JOL assert that summary judgment is inappropriate because triable issues of fact remain as to whether the Fund’s directors would have removed the investment managers if EYCI had alerted them of the valuation fraud, and consequently, whether EYCI’s failure to detect the fraud proximately caused the Fund’s losses.
A. In pari delicto and the Wagoner rule
The equitable defense of in pari delicto, translated from Latin as “in equal fault,” bars a plaintiff from recovering from a defendant where each is equally at fault (Stecher v 85th Estates Co., 43 AD3d 732, 736 [1st Dept 2007]).
In pari delicto is related to, although distinct from, the Wagoner rule, a standing doctrine that takes its name from Shearson Lehman Hutton, Inc. v Wagoner (944 F2d 114 [2d Cir 1991]). The Wagoner rule deprives a bankruptcy trustee of standing to assert a claim against a third party for wrongdoing to the corporation with the cooperation of management (In re Bennett Funding Group, Inc., 336 F3d 94, 100 [2d Cir 2003]; Wight v BankAmerica Corp., 219 F3d 79, 86-87 [2d Cir 2000]). Because a bankruptcy trustee stands in the shoes of the bankrupt corporation, and only has standing to bring any suit that the bankrupt corporation could have brought, if management participated in the wrongdoing, the trustee lacks standing to pursue a claim against a third party, subject to several exceptions (id.). The rationale underlying the Wagoner rule derives from a fundamental principle of agency that the wrongdoing of corporate management committed within the scope of their employment will generally be imputed to the corporation (id.).
The imputation issue that is raised by the JOL’s negligence claim asserted against EYCI for failing to detect the investment *671 managers’ alleged valuation fraud in the midst of its audit implicates the standing aspect of the Wagoner rule, and the fault aspect of the in pari delicto doctrine.[3] After an extensive review of diverse decisions and results, this court has articulated its own standard of review, that effectively synthesizes the relevant rules and exceptions referred to above. The New York Court of Appeals has not yet directly ruled on this issue.
1. Acting Inside or Outside the Scope of Employment
At the outset, the court must resolve the threshold issue of whether the agent’s acts were committed within the scope of employment (In re CBI Holding Co., Inc., 311 BR 350, 372-373 [SD NY 2004], on reh 318 BR 761 [SD NY 2004]). Another way of framing this issue is to inquire whether the agents, in this case, the investment managers, were acting solely for their own or a third party’s benefit (Wight v BankAmerica Corp., 219 F3d 79, 87 [2d Cir 2000]). If so, then the acts of management will be deemed so adverse to the corporation that the conduct will be deemed to be beyond the scope of agency, and imputation will not follow (id.; In re Bennett Funding Group, Inc., 336 F3d at 100; In re Mediators, Inc., 105 F3d 822, 827 [2d Cir 1997] [coined the adverse interest rule, the narrow exception to the Wagoner rule, that rebuts the presumption that the acts and knowledge of an agent are imputable to the principal and applies where the wrongful acts of management are so adverse to the corporation that management is deemed to have totally abandoned the corporation, for its, or a third party’s, sole benefit]).
The JOL fail to raise a triable issue of fact that the investment managers were acting beyond the scope of employment, or otherwise, that they totally abandoned the Fund’s interests to benefit solely themselves. Rather, the record is clear that the investment managers were acting within the scope of their employment, while performing their duties on behalf of the Fund.
Further, it is readily apparent that the Fund stood to receive some degree of financial benefit on account of the investment managers’ alleged wrongdoing, that is reflected in the JOL’s allegations that the investment managers’ false reporting of constant and steady growth permitted the Fund to attract and *672 retain capital from investors, and to maintain its lifeline of funding from Bear Stearns (complaint It 38; transcript of Bull-more deposition at 214, lines 16-19; EYCFs rule 19-A statement 111118-19).
Two of the individual investment managers testified similarly. Irwin and Barry stated that the purpose behind their strategy of reporting smooth gains and stability was to attract capital, and retain existing investors (transcript of Irwin deposition at 179, lines 13-25; at 180, lines 2-11; transcript of Barry deposition at 91, lines 9-23).
The JOL point out that the investment managers personally stood to benefit from higher valuations, insofar as every dollar invested in the Fund translated into higher management incentive fees for themselves. Nonetheless, where a corporation benefits to any extent from the alleged wrongful acts of its agents, the agents cannot be said to have “totally” abandoned the corporation’s interests (see e.g. In re CBI Holding Co., 318 BR at 764).
Moreover, this is not a situation where the alleged wrongdoers were stealing from the Fund, such as by diverting funds to themselves or a third party. Rather, the investment managers allegedly inflated the value of the Fund’s portfolio on behalf of the Fund itself (see e.g. Cenco Inc. v Seidman & Seidman, 686 F2d 449, 454-455 [7th Cir 1982], cert denied 459 US 880 [1982] [where management’s fraudulent valuation scheme involved stealing for the corporation rather than from the corporation, by its nature, management’s acts may be regarded as for the benefit of the corporation]).
Therefore, the court determines that the JOL fail to raise a triable issue of fact that the investment managers totally abandoned the Fund’s interest. Accordingly, the adverse interest exception does not apply, and the investment managers’ alleged wrongdoing is imputable to the Fund based upon agency principles.
2. The Applicability of Other Exceptions
The JOL assert that the Wagoner rule is inapplicable here, because the directors could have stopped the investment managers’ fraud, had EYCI advised them about the valuation discrepancies. Thus, according to the JOL, because not all relevant decision-makers in management were involved in the alleged wrongdoing, the fraud cannot be imputed to the Fund. To this point, the JOL urge the court to apply the “innocent insider” *673 exception to the Wagoner rule, to rebut the presumption of imputation.
The innocent insider exception involves consideration of the organizational structure and internal controls present within the entity. If there were no innocent insiders in senior management capable of stopping the wrongdoing, for instance, because they lacked the authority, then the accountant’s failure to alert management could not have caused the entity’s loss (id.). Thus, the Wagoner rule will not presumptively bar a claim arising out of that wrongdoing, if the “innocent insiders” were both unaware of the misconduct, and had sufficient authority to stop the fraud had they been alerted (see also In re Bennett Funding Group, Inc., 336 F3d at 100).
The innocent insider exception has not been uniformly adopted by the Second Circuit (see e.g. In re CBI Holding Co., 311 BR at 372). In its simplest terms, the utility of the innocent insider analysis is that it may assist courts in considering causation, because a claim for negligence in this context relies upon a causal link between the accountant’s alleged negligence, e.g., failure to alert management, and the corporation’s ultimate loss (id.; see also Gerber Trade Fin., Inc. v Skwiersky, Alpert & Bressler, LLP, 12 AD3d 286, 286 [1st Dept 2004], lv denied 4 NY3d 705 [2005]).
Nonetheless, even if the court were to adopt the innocent insider analysis merely to facilitate its own consideration of causation, the JOL fail to raise a triable issue of fact that EY-CI’s failure to alert the directors ultimately caused the Fund’s losses.
It is undisputed that the investment managers exercised nearly unfettered control over the Fund’s day-to-day activities and operations, and made all investment decisions for the Fund, including the valuation methods employed, and obtaining and retaining subscriptions from investors (complaint 111! 1, 12-15, 23; plaintiffs’ rule 19-A counter-statement 1i 50).
The directors did not participate in any meaningful aspect of the management or decision-making of the Fund, but delegated all management responsibilities and duties to the investment managers, had minimal communication with the Fund’s investors, and performed largely “minor administrative tasks” (EY-CI’s rule 19-A statement lili 33, 35, 50-51; plaintiffs’ rule 19-A counter-statement lili 71, 73-74, 77; transcript of Seymour deposition at 75, lines 21-24; at 77, lines 3-5; at 102, lines 21-22; Young deposition at 84, lines 20-25; at 141, lines 8-17).
*674 The independent directors did not hold a single meeting from the day that the Fund was created in January of 2002, or have any interaction with the Fund’s administrator, until October 7, 2002, when the investment managers reported the NAV discrepancies to the entire board (transcript of Seymour deposition at 102, lines 23-25; at 103, lines 2-16, 17-20; at 188, lines 11-25; at 189, lines 2-5). Further, they did not receive any financial reports from the investment managers or monitor the Fund’s investments (id.).
In total, the directors devoted “not a lot of time” to the Fund, and estimated that the time actually spent performing tasks on behalf of the Fund was “probably a few hours at best” (id. at 104, lines 18-24).
The directors also admit that they did not review the financial statements prior to EYCI’s audit (transcript of Seymour deposition at 180, lines 20-22; at 187, lines 16-25; at 188, lines 2-5; at 192, lines 11-20). Nonetheless, they signed a representation letter to EYCI attesting to the conformity of the financial statements prepared by EYCI with generally accepted accounting principles (id.).
From these undisputed facts, it is impossible to reconcile the JOL’s assertion, and Seymour’s testimony, that the directors would have acted to stop the fraud and immediately remove the investment managers had EYCI alerted them of the valuation discrepancies (transcript of Seymour deposition at 288, lines 12-19). This contention is speculative and unsupported by the factual record.
The directors took no action subsequent to learning of the NAV discrepancies on October 7, 2002, either by conducting an investigation or removing the investment managers. Bear Stearns, the Fund’s broker — and not the directors — contacted the SEC after the NAV discrepancies were disclosed (transcript of Barry deposition at 67, lines 2-4; Daniels deposition at 121, lines 13-16). Thereafter, the investment managers agreed to resign as part of a consent decree entered in the SEC action.
Thus, even assuming arguendo that the directors were “innocent,” insofar as they did not actively participate in the alleged valuation scheme, the JOL fail to raise a triable issue that they were innocent decision-makers capable of stopping the investment managers’ wrongdoing. The directors’ conduct throughout their tenure at the Fund indisputably demonstrates their passivity.
*675 In any event, the court rejects the argument that the directors are “innocent” for several reasons. The undisputed evidentiary record demonstrates that the directors ceded control of the Fund to the investment managers, permitted them to operate the Fund with impunity until they were removed by the SEC, and appear to have ignored their own responsibilities to the Fund by failing to review the financial statements, despite attesting to their accuracy in the representation letter.
Judge Posner recognized that passive corporate actors should not be granted carte blanche to shift the cost of management’s wrongdoing to the corporation’s accountant in the landmark decision in Cenco Inc. (686 F2d 449 [1982]). That action involved a fraudulent scheme that permeated top management to inflate the corporate inventory beyond its actual value (id.). After the fraudulent scheme was unearthed, the corporation, under new management, sought to assert claims against the auditors for malpractice (id.). The court reasoned that even passive stockholders that did not directly participate in management’s scheme were, nonetheless, culpable to some degree as a result of their election of board members that later engaged in wrongdoing, and by their own passivity in failing to supervise them (id. at 455-456).
Thus, in apportioning the burden of fault, the court determined that, while the accountant may have “failed to police its people, Cenco [the corporation] failed as or more dramatically to police its own” (id. at 456; see also Restatement [Third] of Agency § 5.03, Comment b [“Imputation creates incentives for a principal to choose agents carefully and to use care in delegating functions to them”]).
While the Cenco defense, as it has been coined, is a narrow one, its reasoning is applicable here. The JOL’s assertion that the directors were innocent and willing and able to stop the alleged fraud rings hollow in light of the undisputed evidentiary record that demonstrates the directors’ willful passivity. Thus, the investment managers and directors are, at best, in pari delicto. Accordingly, imputation of the investment managers’ conduct to the Fund is appropriate.
B. Williamson
The JOL principally rely upon Judge Moskowitz’s holding in Williamson to argue that the Wagoner rule and imputation is inapplicable to the facts present here. The Williamson action was initiated by a court-appointed trustee of a hedge fund, for *676 the purpose of bringing an action against the fund’s former directors and portfolio manager, Ed Strafaci, amongst others, who were allegedly utilizing improper valuation methods to inflate the value of the fund’s holdings. The trustee sought to assert a claim against the fund’s auditor for negligence because it failed to bring the errors contained in the financial statements to the attention of senior management.
Williamson is significantly distinguishable from this action. In Williamson, the court determined that there was sufficient evidence to raise a triable issue that Strafaci was acting purely to benefit himself, insofar as he received unwarranted compensation from the inflated values of the fund’s portfolio, and that his valuation scheme did not benefit the fund, because it operated like a Ponzi scheme ('Williamson slip op at 16). Further, in response to questioning as to whether he intentionally overstated values for the purpose of obtaining increased personal compensation, Strafaci pleaded the Fifth Amendment defense (id.). On this basis, the court found that it could not determine as a matter of law that the adverse interest exception to imputation was inapplicable (id).
Here, in contrast, the JOL failed to raise a triable issue that the investment managers acted solely for their own benefit. The evidentiary record supports the contention that the Fund financially benefitted, in part, from the alleged inflation of the Fund’s NAV insofar as the Fund was able to attract and retain capital. Further, the investment managers have flatly denied committing any fraud in connection with their valuation of the Fund’s portfolio (transcript of Daniels deposition at 99, line 16; Irwin deposition at 116, line 16, Miszkiewicz deposition at 73, lines 7-9, Barry deposition at 50, line 7).
Moreover, in Williamson, the court specifically determined that there was no evidence that senior management participated in any capacity in Strafaci’s misconduct, suggesting that Strafaci was but one bad apple amidst the top level managers at the Fund (Williamson slip op at 16). Consequently, the court presumed that senior management could have, and would have, acted to stop Strafaci’s “financial shenanigans” (id.).
Here, the evidentiary record establishes that the investment managers were senior management: they effectively controlled every aspect of the Fund’s operations, and for agency purposes, *677 were the Fund’s sole agents[4] (see e.g. In re Parmalat Sec. Litig., 477 F Supp 2d 602, 610 [SD NY 2007]). Further, the facts present here do not permit an inference that the directors would have, or even could have, stopped the alleged valuation scheme, had they been alerted, and the JOL otherwise fail to raise a triable issue of fact that there was a causal link between EYCI’s audit and the Fund’s ultimate losses.
In any event, the court rejects this “would-a, could-a, should-a” standard for determining whether to impute, in circumstances where the alleged wrongdoing does not pervade senior management (In re Bennett Funding Group, Inc., 336 F3d at 101).
Another key difference is the degree of alleged fault on the part of the auditor vis-a-vis the other tortfeasors amongst management. In Williamson, the financial statements that formed the basis of the negligence claim against the auditors covered a five-year period, from 1995 to 2000, and the auditor allegedly had “direct knowledge” that Strafaci was inflating values (Williamson complaint 1Í1Í1, 3, 11, 46, 70).
Here, EYCI conducted the only audit of the Fund which covered a three-month time period. Further, the JOL even allege that the investment managers made material misrepresentations to EYCI while it was preparing its audit, in the complaint and in the BAG action (complaint 1Í1T 41, 70; BAG action complaint 1i1i 4, 38-40, 50-54). Additionally, the court in the Caymanian proceedings determined that EYCI relied upon the investment managers’ reorientations in conducting the audits (Caymanian proceedings, May 2, 2008 decision 1Í 57).
Finally, the JOL assert that they should be permitted to pursue their claim against EYCI because they are innocent successors in interest, and the ultimate beneficiaries of any recovery would be for the benefit of the innocent investors, and not the investment managers that engaged in alleged wrongdoing (JOL’s mem of law at 9). Williamson appears to endorse this view.
The court respectfully disagrees that there is an “innocent successor” exception to the Wagoner rule and imputation. Adopting such an exception would fly in the face of the well-established agency principles that the knowledge and conduct of *678 an agent acting within the scope of employment are imputable to the principal (Seward Park Hous. Corp. v Cohen, 287 AD2d 157, 167 [1st Dept 2001]).
Additionally, adopting an innocent successor exception here for the benefit of the Fund’s investors would be inconsistent with the well-settled principle that a negligence claim against a corporate accountant belongs to the corporation-client, unless there is privity between the accountant and the nonclient claiming harm (Securities Inv. Protection Corp. v BDO Seidman, 95 NY2d 702, 711-712 [2001]; Credit Alliance Corp. v Arthur Andersen & Co., 65 NY2d 536, 545-549 [1985]). The JOL have not even alleged that EYCI could be held liable to the Fund’s investors in negligence, because EYCI and the investors are not in privity or in a relationship approaching privity. The Fund, as EYCI’s client, is the only party that is permitted to recover against EYCI for its alleged negligence stemming from the audit, and not the Fund’s investors. However, because the investment managers’ alleged wrongdoing while acting within the scope of their employment is imputed to the Fund, the JOL, suing on behalf of the Fund, are barred from asserting that claim. Therefore, EYCI’s motion for summary judgment is granted.
Due to this disposition, the court need not address the parties’ remaining arguments, and the motion to strike certain portions of the JOL’s expert report is necessarily rendered moot.
Accordingly, it is ordered that the motion (sequence No. 010) by defendant Ernst & Young Cayman Islands, to strike certain opinions submitted by the plaintiffs’ expert, is denied as moot; and it is further ordered that the motion (sequence No. Oil) by defendant Ernst & Young Cayman Islands, for summary judgment dismissing the remaining cause of action for negligence, is granted, and the complaint is dismissed with costs and disbursements to defendant as taxed by the Clerk of the Court upon submission of an appropriate bill of costs; and it is further ordered that the Clerk is directed to enter judgment accordingly.

. For a full recitation of the background in this action see Bullmore v Ernst & Young Cayman Is. (45 AD3d 461, 461 [1st Dept 2007]).

. Different groups of investors instituted three separate actions against the investment managers, ATC, and EYCI.
The JOL additionally commenced an action against two brokerage firms, Prudential Securities and Banc of America Securities LLC, that allegedly facilitated the investment managers’ valuation fraud, by corroborating values determined by the investment managers that were known to be false (BAS action).

. Although the JOL are not bankruptcy trustees, they are in an analogous position to the extent that they are court-appointed professionals, that have standing to institute any suit that the Fund itself could have brought had it not instituted winding-up proceedings.

. The court in the Caymanian proceedings came to the same conclusion, finding that the investment managers were a “pivotal part of the management of the Funds” (Caymanian proceedings, May 2, 2008 decision UU 16, 54, 57-58, 61, 116).