09-2020-cv (L)
Kirschner v. KPMG LLP

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2009

Heard: September 18, 2009        Decided: December 23, 2009
                              Corrected: December 28, 2009

Docket Nos. 09-2020-cv (L), -2027-cv (CON)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
MARC S. KIRSCHNER, as Trustee of the Refco
Litigation Trust,
          Plaintiff-Appellant,

            v.

KPMG LLP, GRANT THORNTON LLP, MAYER BROWN LLP,
INGRAM MICRO, INC., CIM VENTURES, INC., WILLIAM
T. PIGOTT, MAYER BROWN INTERNATIONAL LLP,
PRICEWATERHOUSECOOPERS LLP, LIBERTY CORNER
CAPITAL STRATEGIES, LLC, BANC OF AMERICA
SECURITIES, LLC, CREDIT SUISSE SECURITIES (USA)
LLC, and DEUTSCHE BANK SECURITIES, INC.,
          Defendants-Appellees.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, PARKER, and LIVINGSTON, Circuit Judges.

Appeal from the May 8, 2009, judgment of the United States District Court for the Southern District of New York (Gerard E. Lynch, District Judge), dismissing a suit brought by the trustee of a litigation trust, resulting from a bankruptcy proceeding, in which the trustee alleged misconduct by corporate insiders and advisers. The District Court ruled that the trustee lacked standing because the insiders' misconduct was imputed to the corporation. On appeal, the

trustee contends that the "adverse interest" exception precludes imputation.

Questions of New York law certified to the New York Court of Appeals.

Kathleen M. Sullivan, Quinn Emanuel Urquhart Oliver & Hedges, LLP, New York, N.Y. (Richard I. Werder, Jr., Sascha N. Rand, Sanford I. Weisburst, K. McKenzie Anderson, Quinn Emanuel Urquhart Oliver & Hedges, LLP, New York, N.Y., on the brief), for Plaintiff-Appellant.

Linda T. Coberly, Winston & Strawn LLP, Chicago, Ill., for Defendant-Appellee Grant Thorton LLP.

Kevin A. Burke, Howrey, LLP, New York, N.Y. (Gary F. Bendinger, Sarah D. Abeles, Howrey LLP, New York, N.Y., on the brief), for Defendant-Appellee KPMG LLP.

Philip D. Anker, Lori A. Martin, John V.H. Pierce, Anne K. Small, Jeremy S. Winer, Wilmer Cutler Pickering Hale and Dorr LLP, New York, N.Y., on the brief, for Defendants-Appellees Banc of America Securities, Credit Suisse Securities and Deutsche Bank Securities.

Anthony Candido, Clifford Chance LLP, New York, N.Y., on the brief, for Defendant-Appellee Mayer Brown International.

James J. Capra, Jr., Orrick, Herrington & Sutcliffe LLP, New York, N.Y., Kenneth Y. Turnbull, Orrick, Herrington & Sutcliffe LLP, Washington, D.C., on the brief, for Defendant-Appellee PricewaterhouseCoopers.

Robert F. Wise, Jr., Paul Spagnoletti, Davis Polk & Wardell LLP, New York, N.Y., on the

brief, for Defendants-Appellees Ingram
Micro, Inc. and CIM Ventures, Inc.

Kevin H. Marino, John D. Tortorella, Marino,
Tortorella & Boyle, P.C., Chatham, N.J., on
the brief, for Defendants-Appellees William
Pigott and Liberty Corner Capital
Strategies.

John K. Villa, George A. Borden, Craig D.
Singer, Williams & Connolly LLP,
Washington, D.C., on the brief, for
Defendant-Appellee Mayer Brown LLP.

JON O. NEWMAN, Circuit Judge.

This appeal concerns the standing of the trustee of a bankrupt corporation's litigation trust to sue third parties who allegedly assisted corporate insiders in defrauding the corporation's creditors. The appeal primarily raises the issue of whether, under New York law, the acts of the corporate insiders can be imputed to the corporation, in which event, pursuant to the so-called Wagoner rule, the trustee for a debtor corporation lacks standing to recover against third parties for damage to the creditors, see Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991), or whether the "adverse interest" exception precludes imputation.  Plaintiff-Appellant Marc Kirschner ("the Trustee"), in his capacity as the Trustee of the Refco Litigation Trust, appeals from the May 8, 2009, judgment of the District Court for the Southern District of New York (Gerard E. Lynch, then District Judge), dismissing the Trustee's suit for lack of

-3-

standing under the <u>Wagoner</u> rule.  <u>See</u> <u>Kirschner v. Grant Thornton LLP</u>, 07 Civ. 11604, 2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009).  The Trustee brought the suit on behalf of Refco Group Ltd., LLC ("RGL"), its indirect subsidiary, Refco Capital Markets, Ltd. ("RCM"), and Refco Inc., the entity created by Refco's initial public offering (collectively "Refco") against senior management of Refco, law firms, and accounting firms that allegedly participated in defrauding Refco's creditors.

The Trustee principally argues that the District Court erred in imputing the insiders' wrongdoing to Refco because, the Trustee contends, the Refco insiders, in perpetrating the fraud, totally abandoned Refco's interests, and therefore the adverse interest exception to imputation applies.  We conclude that the issues concerning imputation and the adverse interest exception raise questions of New York law as to which considerable uncertainty exists. We therefore certify to the New York Court of Appeals questions the answers to which will govern our ultimate disposition of this appeal.

Background

Making clear why we believe certification of state law questions is needed requires a detailed account of the Trustee's factual allegations and a full understanding of the District Court's opinion.

The background facts are taken from the Trustee's complaint, the allegations of which are assumed to be true for purposes of

-4-

adjudicating the Defendants' motion to dismiss.  These facts are well summarized in the District Court's opinion:

## I. The Refco Fraud

Prior to its collapse in the fall of 2005, Refco was among the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets. (Compl. ¶ 56)  Beginning in the late 1990s, Refco's controlling officer-shareholders--Phillip R. Bennett, Tone N. Grant, Robert C. Trosten, and Santo C. Maggio (collectively, the "insiders")--with the aid of certain professionals and financial advisors, orchestrated a complex fraudulent scheme to artificially enhance Refco's performance and conceal Refco's true financial condition, so that these insiders, through the company's August 2004 leveraged buy-out ("LBO") and its August 2005 IPO, could cash out their interests in Refco on lucrative terms. (Compl. ¶¶ 4-7, 32, 59-149) That scheme, which has been thoroughly discussed in [the District] Court's prior opinions, involved both concealment of Refco's uncollectible debt and the misappropriation of customer assets.

The concealment of Refco's uncollectible debt involved a two-part process.  First, hundreds of millions of dollars in uncollectible trading losses and other operating expenses were transferred and converted into legitimate receivables owed to Refco by RGHI, a related-party holding company, or "alter-ego[,]" owned by Bennett and Grant. (Compl. ¶¶ 35, 39, 60, 65, 68)  These transfers offloaded debt from Refco, specifically RGL--the holding company through which Refco's business was primarily conducted prior to the IPO and which was controlled by RGHI--and artificially inflated RGL's earnings capability. (Compl. ¶ 68)  Refco's apparent financial outlook was further improved by the fact that Refco then charged RGHI as much as 35 percent interest on the sham receivables, which between 2001 and 2004 amounted to at least $250 million. (Compl. ¶ 71) Although that accrued interest was recorded as income at Refco, it was never, in fact, collected. (Id.)

Next, the insiders disappeared the receivables parked at RGHI through a series of so-called round-trip loans.

-5-

This additional maneuver was necessary because the disclosure of large "related-party" receivables--the sum of which dwarfed Refco's net income--would have raised red flags among investors and regulators. (Compl. ¶¶ 75-78) These "loans," which straddled the end of each fiscal year starting in 1998 and, after the LBO, at the end of several fiscal quarters as well, all worked in essentially the same way. (Compl. ¶¶ 77-79) Several days before Refco closed its books for each financial period, RCM--an unregulated, indirect subsidiary wholly owned by RGL and thus by Bennett and Grant (Compl. ¶¶ 32, 57)--would loan hundreds of millions of dollars to a third-party customer who then, through the customer's account at Refco, simultaneously loaned the same amount to RGHI. (Compl. ¶ 78) The loan agreements between the third party and RCM--which were done on a book basis (the principal never changed hands)--were meticulously structured so that they were essentially risk-free to the third-party customers: the customers' loans to RGHI were guaranteed by Refco, and the customers profited for their participation in the "loans" through interest earned on their loans to RGHI, which by design exceeded the interest they were charged by RCM. (Compl. ¶ 79-81) RGHI, in turn, used the loans from the customers to pay down the money it owed to Refco for its uncollectible receivables. (Compl. ¶ 78) The net effect of these transactions was that at the close of each reporting period, Refco's books would show apparently legitimate loans to third-party customers, and the RGHI receivables would be gone. (Id.) Then, just days after the financial period closed, the transactions were unwound--the "loans" were repaid, and the uncollectible receivables from RGHI were returned to Refco's books. (Compl. ¶ 79) Through these transactions, Refco lent money to itself, through third parties, to conceal its trading losses, its true operating expenses, and the fictitious nature of hundreds of millions of dollars in revenue. (Compl. ¶ 83)

In addition to concealing Refco's debt, the insiders routinely misappropriated customer assets held at RCM in order to obtain cash infusions to prop up other Refco entities. (Compl. ¶¶ 57, 94-95) This cash was distributed to Refco affiliates through a series of intercompany transfers that contained no safeguards and for which no appropriate documents were kept. (Compl. ¶¶ 7, 94-105) Although the receiving entities had no ability to repay these "loans,"

-6-

Refco's overall financial health depended on the steady influx of these illicit RCM assets (Compl. ¶¶ 95, 98), and, accordingly, the insiders kept careful track of these transactions and distributed among themselves daily "cash flow" statements that calculated the amount of customer assets available for diversion to other Refco entities. (Compl. ¶¶ 99-100) The size of these uncollateralized intercompany transfers--like the size of Refco's concealed debt--was substantial; they involved hundreds of millions of dollars and dwarfed Refco's total capital. (Compl. ¶¶ 101, 104, 329) At the time of the LBO, Refco affiliates owed RCM approximately two billion dollars. (Compl. ¶ 102)

## II. The LBO and IPO

The illusion of a thriving company enabled Refco insiders to position Refco for, and ultimately to carry out, what appeared to be a legitimate "buy-out" of the insiders' interests for far more than those interests were worth. In 2004, after a number of unsuccessful attempts at the partial or complete sale of their interests in Refco (Compl. ¶ 106), Thomas H. Lee Partners ("THL"), a private equity firm, purchased a 57 percent controlling interest in Refco for $507 million as part of a leveraged buy-out transaction ("LBO") (Compl. ¶¶ 112-13). For its part, Refco sold $600 million in unregistered notes to the Investment Bank Defendants and obtained $800 million in financing. (Compl. ¶¶ 113, 338) This $1.4 billion of bank and bond debt, which Refco could not possibly repay (Compl. ¶ 132), became senior to the debt owed to RCM, Refco's largest creditor. (Compl. ¶ 114) The LBO was lucrative, however, for the insiders: Bennett and others received $106 million, with at least $25 million going to Bennett personally. (Compl. ¶ 113)

Less than a year after the LBO, with Refco still concealing its grim financial condition, Refco insiders and THL led Refco through an initial public offering of its stock. The offering generated $258.5 million in proceeds for Refco Inc. and approximately $289.5 million in proceeds for the selling shareholders. (Compl. ¶ 341) Some of the IPO proceeds were used to retire part of RGL's LBO debt—a move that the Trustee characterizes as "waste" because RGL was already insolvent (Compl. ¶ 136)--but, consistent with maintaining Refco's good reputation and the ongoing concealment of the Refco fraud, no proceeds were used to

-7-

repay the amounts owed to RCM or to pay down the RGHI receivables. (Compl. ¶¶ 45-47, 134-36)  Instead, the insiders used the proceeds to pay themselves, other equity holders, and the Investment Bank Defendants. (Compl. ¶¶ 135, 342) Bennett himself sold approximately seven million shares through his holding vehicles for a total price of $146 million, and THL and its affiliates sold approximately ten million shares of Refco common stock, with a total sale price of approximately $223 million. (Compl. ¶134)  Weeks after the IPO, in the wake of the public disclosure of the RGHI receivables, Refco and its subsidiaries and affiliates declared bankruptcy. (Compl. ¶ 32)

III. The Refco Litigation Trust

On December 15, 2006, approximately fourteen months after Refco filed for bankruptcy, the United States Bankruptcy Court for the Southern District of New York confirmed the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries (the "Plan"). (Compl. ¶ 31)   The Plan provided for the establishment of a Litigation Trust and the appointment of a Litigation Trustee to pursue any claims and causes of action transferred from the bankruptcy estates of RGL, RCM and Refco Inc. (Compl. ¶¶ 31-32)

Kirschner, 2009 WL 1286326, at *1-*4 (footnotes omitted) (punctuation slightly altered).

The lawsuit. The Trustee, in the shoes of RGL, RCM, and Refco Inc., then brought the pending lawsuit against certain Refco insiders, professionals, and advisors for fraud, breach of fiduciary duty, and malpractice.[1]  Among the defendants, the investment bank, various

---

[1]The suit was originally filed in the Circuit Court of Cook County, Illinois, then removed to the United States District Court for the Northern District of Illinois, and then transferred to the District Court for the Southern District of New York by the Panel on Multidistrict Litigation.

-8-

professional firms, and several third-party participants in the "round-trip loans" filed motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[2] The District Court concluded that standing was lacking and granted the motions.

The District Court's opinion. Judge Lynch began by stating that "[u]nder New York law, a bankruptcy trustee lacks standing to seek recovery on behalf of a debtor company against third-parties for injuries incurred by the misconduct of the debtor's controlling managers." Id. at *5 (footnote omitted). He also stated that this principle applies to the standing of the Trustee of the Refco Litigation Trust. See id. n. 12 (citing In re Mediators, Inc., 105 F.3d 822, 826 (2d Cir. 1997) (applying Wagoner to suit brought by a creditors' committee)). The lack of standing, he explained, results from the imputation of the insiders' conduct to the corporation under agency principles. See id.

Judge Lynch then stated several propositions for determining whether the "adverse-interest" exception to the Wagoner rule applied. First, he explained, the corporate officer must have "totally abandoned" the corporation's interests and "be acting entirely for his

_____

[2]The motions were filed by Credit Suisse Securities (USA) LLC (f/k/a Credit Suisse First Boston LLC), Banc of America Securities LLC, Deutsche Bank Securities Inc., Grant Thornton LLP, Mayer Brown LLP, Mayer Brown International LLP, Ernst & Ernst LLP, PricewaterhouseCoopers LLP, Liberty Corner Capital Strategies LLC, Ingram Micro, Inc., CIM Ventures, Inc., and William T. Pigott.

-9-

own or another's purpose." Id. (internal quotation marks deleted); see Mediators, 105 F.3d at 827. He quoted from our recent decision in In re CBI Holding Co. v. Ernst & Young, 529 F.3d 432, 448 (2d Cir. 2008), which explained that "when an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, . . . he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose." Kirschner, 2009 WL 1286326, at *6; see People v. Kirkup, 4 N.Y.2d 209, 213-214, 173 N.Y.S.2d 574 (1958); Benedict v. Arnoux, 154 N.Y. 715, 729 (1898). Judge Lynch also recognized, as we said in CBI, that "New York courts have cautioned that [the adverse interest] exception is a narrow one and that the guilty manager 'must have totally abandoned' his corporation's interests for [the exception] to apply." Kirschner, 2009 WL 1286326, at *6 (quoting CBI, 529 F.3d at 448); see Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782, 784-85, 497 N.Y.S.2d 898 (1985). Next Judge Lynch noted that whether the agent's actions were adverse to the corporation turns on the "'short term benefit or detriment to the corporation, not any detriment to the corporation resulting from the unmasking of the fraud.'" Kirschner, 2009 WL 1286326, at *6 (quoting In re Wedtech Corp., 81 B.R. 240, 242 (S.D.N.Y. 1987)).

All of these propositions appear to correctly reflect New York law concerning the adverse interest exception, and we do not understand the parties to dispute them. As Judge Lynch applied these

-10-

propositions to the Trustee's allegations, however, he interpreted New York law in ways that bring the parties into sharp dispute concerning certain aspects of the adverse interest exception. The dispute concerns both the state of mind of the insiders and the harm to their corporation.

State of mind. Judge Lynch noted the Trustee's argument "that the adverse-interest exception . . . applies because the insiders intended to benefit only themselves." Id. at *7. In CBI we had said "that the 'total abandonment' standard," which must be met for the adverse interest exception to apply, "looks principally to the intent of the managers engaged in misconduct." CBI, 529 F.3d at 451. Judge Lynch acknowledged this statement from CBI, see Kirschner, 2009 WL 1286326, at *7, but discounted its significance by noting that CBI was concerned with the district court's rejection of the bankruptcy court's finding that the real reason for the insider's fraud in CBI was to maximize his bonus. See id. CBI ruled that the bankruptcy court's finding as to the insider's intent was not clearly erroneous. See CBI, 529 F.3d at 449. Judge Lynch further stated that "the participants' intent" is not the "'touchstone'" of the analysis,[3]

_____

[3]New York cases seem to support this statement. See Farr v. Newman, 14 N.Y.2d 183, 190, 250 N.Y.S.2d 272 (1964) ("A conflict of interest does not avoid the imputation of knowledge. . . . 'The mere fact that the agent's primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for principal's

-11-

<u>Kirschner</u>, 2009 WL 1286326, at *7, and that <u>CBI</u> does not "hold that the mere allegations of an insider's intent to personally profit is sufficient to defeat application of the <u>Wagoner</u> rule at the pleading stage." <u>Id.</u> As he explained, "[The <u>Wagoner</u> rule] addresses the question of who has a claim for relief, which, in the context of fraud, means who has been harmed and who has benefitted by the fraudulent conduct alleged. This question concerns the nature and consequences of the alleged fraud, not the extent to which the perpetrators acted from self-interested motives." <u>Id.</u> (footnote omitted).

<u>Harm.</u> Judge Lynch further stated that "the Trustee must allege, not that the insiders intended to, or to some extent did, benefit from their scheme, but that the corporation was <u>harmed</u> by the scheme, rather than being one of its beneficiaries." <u>Id.</u> (emphasis in original). On the other hand, <u>CBI</u> had stated that "[e]vidence that

---

interests.'") (quoting Restatement (Second) of Agency § 382 (1994)); <u>Center</u>, 66 N.Y.2d at 785, 497 N.Y.S.2d 898 ("[The adverse interest exception] cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal."); <u>Henry v. Allen</u>, 151 N.Y. 1, 9 (1896); <u>546-552 West 146th Street LLC v. Arfa</u>, 54 A.D.3d 543, 863 N.Y.S.2d 412 (N.Y. App. Div. 2008) (holding that the exception is not triggered by allegations that the insiders received personal commissions that resulted in their employers' paying more to buy properties). However, other New York cases may be read to make intent more significant. <u>See</u> <u>Marine Midland Bank v. John E. Russo Produce Co.</u>, 50 N.Y.2d 31, 427 N.Y.S.2d 961 (1980); <u>Capital Wireless Corp. v. Deloitte & Touche</u>, 216 A.D.2d 663, 627 N.Y.S.2d 794 (N.Y. App. Div. 1995).

CBI <u>actually benefitted</u> from CBI's management's fraud does not make the bankruptcy court's finding that CBI's management did not <u>intend to benefit</u> the company clearly erroneous." <u>CBI</u>, 529 F.3d at 451 (emphasis added). <u>CBI</u> placed some reliance on <u>Capital Wireless Corp. v. DeLoitte & Touche</u>, 216 A.D. 2d 663, 627 N.Y.S.2d 794 (N.Y. App. Div. 1995), which had ruled that a triable issue existed because although the "fraud generated much needed financing for plaintiff and forestalled its bankruptcy," the wrongdoer might still have totally abandoned the company's interest. <u>See</u> <u>id.</u> (citing <u>Capital Wireless</u>, 216 A.D.2d at 666, 627 N.Y.S.2d at 797).

In the pending case, Judge Lynch ruled that "[t]he complaint is saturated by allegations that Refco received substantial benefits from the insiders' alleged wrongdoing." <u>Kirschner</u>, 2009 WL 1286326, at *6. He recounted the following:

> The Trustee alleges both that had Refco's trading losses been disclosed, it would have "severely damaged Refco's business" and that the improper round-trip loans and misappropriation of customer assets at RCM were designed to, and did, in fact, buttress Refco's organization. (Compl. ¶¶ 32, 64, 492) The illicit cash flow from RCM, in particular, was used for a "wide variety of general and specific funding purposes by various Refco affiliates who would not have been able to sustain their reported financial health and operations without using funds stolen from RCM." (Compl. ¶ 98) These benefits are plainly evident in the Trustee's allegations that the insider's conduct enabled the false reporting of the company's steady growth, which in turn, attracted and retained capital from investors in the LBO and the IPO. (Compl. ¶¶ 94-105) Indeed the gravamen of the Trustee's allegations is not that the insiders stole assets <u>from</u> Refco, but rather that the insiders' fraudulent scheme

-13-

was to steal _for_ Refco--to inflate the value of Refco's interests on behalf of Refco itself by maintaining the illusion that Refco was "fast-growing, highly profitable, and able to satisfy its substantial working capital needs without having to borrow money." (Compl. ¶ 94)

Id. (emphasis in original) (punctuation slightly altered). Judge Lynch placed some reliance on Bullmore v. Ernst & Young Cayman Islands, 20 Misc. 3d 667, 861 N.Y.S.2d 578 (N.Y. Sup. Ct. 2008), which found no standing for liquidators where the insiders "inflated the value of the Fund's portfolio on behalf of the Fund itself." Id. (citing Bullmore, 20 Misc. 3d at 672, 861 N.Y.S.2d at 583).

Judge Lynch also reckoned with the Trustee's arguments that the insiders' misconduct in fact harmed Refco. First, he considered the argument

that RCM, RGL, and Refco Inc. were injured by an "imprudent" LBO and IPO (Compl. ¶¶ 352, 463), in that RCM was injured when the receivables owed to it by other Refco entities were subordinated by the receivables owed to the Investment Bank Defendants following the LBO (Compl. ¶ 336), RGL was damaged when it incurred $1.4 billion in new LBO debt and was no longer able to repay the funds diverted from RCM to RGL and its affiliates (Compl. ¶¶ 452, 460, 476), and Refco, Inc. was injured when it was "saddled with hundreds of millions of dollars in liability to the purchasers of Refco stock," and used $231 million in proceeds from the IPO to retire part of RGL's LBO debt (Compl. ¶¶ 136-37).

Id. at *8. He rejected these allegations of "harm," pointing out that "[i]t is a basic principle of corporate finance that extending credit to a distressed entity in itself does the entity no harm." Id.

Second, he reckoned with "[t]he Trustee's attempt to parse the

-14-

Refco fraud in pursuit of establishing a corporate injury to some particular corporate unit within Refco." Id. at *9. He rejected this argument essentially because any harm to a Refco entity benefitted the entire Refco fraud:

> Both Refco's round-robin fraud and its distribution of LBO and IPO debt were dedicated to "maintain[ing] the illusion of [the] financial and operational strength and stability" of Refco. (Compl. ¶ 4) Both RCM and RGL participated--for good and for ill--in the Refco fraud. Although the assets at RCM were siphoned to other Refco entities, the Trustee acknowledges that absent Refco's--and preeminently RGL's--artificially-induced solvency, customers would not have "continued [to make] deposits of cash and securities . . . needed to facilitate and fund" the corporation. (Compl. ¶¶ 60, 63) In turn, the fact that RGL was "finance[d]" and "prop[ped] up" by assets misappropriated from RCM (Compl. ¶¶ 7, 448), benefitted RGL. The concealment of Refco's losses "maintained the illusion that Refco was a highly successful, financially secure broker-dealer." (Compl. ¶ 2) The fact that RGL could not repay its "loans" to RCM upon incurring $1.4 billion in new LBO debt (Compl. ¶¶ 452, 460, 476), . . . is a harm not to RGL, but to RGL's creditors, to whom the assets were owed.

Id. (punctuation slightly altered).

The parties' contentions. The Trustee contends that the District Court erred in several respects: (1) the adverse interest exception to the Wagoner rule was available, at least at the pleading stage, because the complaint adequately alleged the intent of the insiders to benefit themselves, Br. for Appellant at 25-32; (2) whatever benefits the insiders conferred on Refco should not have precluded the adverse interest exception because these benefits were "of the 'illusory' short-term variety," id. at 33 (quoting CBI, 529 F.3d at 453); (3) the

-15-

"sole actor" exception to the adverse interest exception was inapplicable,[4] id. at 36-38; (4) the adverse interest exception does not require an allegation of harm to the corporation, id. at 40-42; (5) if harm needs to be alleged, it may not be shown by treating a corporation and its affiliated corporations as a single enterprise, id. at 42-45; (6) if harm needs to be alleged, it was adequately alleged with respect to each of the separate corporate entities--RCM, RGL, and Refco Inc., id. at 45-54.

The Appellees respond that: (1) the adverse interest exception does not depend on the insiders' intent, Br. for Appellees at 3, 19, 24-31; (2) the adverse interest exception requires harm to the corporation, id. at 20, 34-36; (3) the insiders' acts conferred benefits on the corporation, id. at 30-34; (4) in assessing the harm caused by the insiders' conduct, Refco and its subsidiaries should all be considered part of a single enterprise, id. at 37; (5) even if the subsidiaries are considered separately, the insiders' conduct caused them no harm, id. at 38-44; and (6) even if the adverse interest

---

[4]The "sole actor" exception to the adverse interest exception applies "where the principal and agent are one and the same," e.g., where the wrongdoer is the sole shareholder of the corporation. See Mediators, 105 F.3d at 827. It is not clear that the District Court applied the sole actor exception to the adverse interest exception (as distinguished from simply ruling that the requirements for the adverse exception were not met). The Trustee points to Judge Lynch's observation in a footnote that "the relevant shareholders prior to the LBO were, themselves, the insiders conducting the fraud." Br. for Appellant at 37 (quoting Kirschner, 2009 WL 1286326, at *9 n.16).

-16-

exception were otherwise applicable, it would be precluded by the "sole actor" exception to the adverse interest exception, <u>id.</u> at 44-52.

Agreeing that New York law determines the availability of the adverse interest exception to the <u>Wagoner</u> rule, both sides have enlisted the same New York decisions for their respective positions: <u>Center v. Hampton Affiliates, Inc.</u>, 66 N.Y.2d 782, 497 N.Y.S.2d 898 (1985); <u>Marine Midland Bank v. John E. Russo Produce</u>, 50 N.Y.2d 31, 427 N.Y.S.2d 961 (1980); <u>Capital Wireless Corp. v. Deloitte & Touche</u>, 216 A.D.2d 663, 627 N.Y.S. 2d 794 (App. Div. 1995); <u>Bullmore v. Ernst & Young Cayman Islands</u>, 20 Misc. 3d 667, 861 N.Y.S.2d 578 (Sup. Ct. 2008). Their differing uses of New York cases, coupled with the somewhat divergent language used by the District Court in the pending case and by our Court in <u>CBI</u>, both endeavoring to interpret New York law, make it appropriate to seek authoritative guidance from the New York Court of Appeals. Although the precise allegations in the pending case are distinctive, the recent frequency of insider misconduct in the corporate world underscores the virtue of using certification.

Accordingly, pursuant to N.Y. Rules of Court § 500.27 (McKinney 2010) and Second Circuit Local Rule § 0.27, we certify to the New York Court of Appeals (1) the over-arching question whether the allegations of the complaint in this case satisfy the "adverse interest" exception

-17-

to the _Wagoner_ rule of imputing insiders' misconduct to their corporation, and the following subsidiary questions subsumed within that ultimate question: (2) whether the adverse interest exception is satisfied by showing that the insiders intended to benefit themselves by their misconduct; (3) whether the exception is available only where the insiders' misconduct has harmed the corporation; (4) if harm is required, whether the analysis of such harm may include any detriment to a corporation resulting from the eventual unmasking of the misconduct; (5) if harm is required, whether such harm may be determined by considering a corporation and its related corporations as a single enterprise; (6) if harm is required and is to be determined with respect to separate though related corporations, whether the allegations of the complaint adequately allege such harm; (7) whether the exception is precluded where the misconduct conferred some benefit upon the corporation; and (8) if the adverse interest exception were otherwise available, would it be precluded by the "sole actor" rule?  If the Court of Appeals is disinclined to answer or at least discuss all of these questions, we hope it will focus its attention on questions (2) and (3).

As is our custom, we invite the Court of Appeals to expand upon or vary the terms of these questions as that Court deems appropriate. See _In re Peaslee_, 547 F.3d 177, 186 (2d Cir. 2008); _Consorti v. Owens-Corning Fiberglas Corp._, 45 F.3d 48, 51 (2d Cir. 1995).

-18-

We direct the Clerk to transmit to the New York Court of Appeals this opinion as our certificate, together with the parties' briefs and appendix. This panel will resume its consideration of the appeal after disposition of this certification by the New York Court of Appeals.